No. 05-6396

In the United States Court of Appeals for the Fourth Circuit

Jose Padilla,
Petitioner-Appellee

v.

Commander C.T. Hanft,
USN Commander, Consolidated Naval Brig,
Respondent-Appellant

FILED

MAY – 6 2005

U.S. Court of Appeals
Fourth Circuit

On Appeal from the United States District Court
for the District of South Carolina

Opening Brief for the Appellant

Jonathan S. Gasser
  United States Attorney
  District of South Carolina

Miller W. Shealy, Jr.
  Assistant United States Attorney
  District of South Carolina

Paul D. Clement
  Acting Solicitor General

David B. Salmons
Daryl Joseffer
  Assistants to the Solicitor General

Stephan E. Oestreicher, Jr.
  Attorney, U.S. Department of Justice
  P.O. Box 899, Ben Franklin Station
  Washington, DC 20044-0899
  (202) 305-1081

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................... i

TABLE OF AUTHORITIES ............................................. iii

JURISDICTIONAL STATEMENT ......................................... 1

STATEMENT OF THE ISSUE ........................................... 2

STATEMENT OF THE CASE ............................................ 3

STATEMENT OF FACTS ............................................... 5

    I.      The Attacks of September 11 and Congress's Authorization
          of Force ................................................. 5

    II.     The Factual Basis for Padilla's Military Detention ............. 6

    III.   The District Court Proceedings ............................. 13

SUMMARY OF ARGUMENT ........................................... 15

ARGUMENT ...................................................... 18

    The President Has Authority Under The Constitution
    And Congress's Authorization Of Force To Detain Padilla
    As An Enemy Combatant Without Charging Him Criminally ........ 18

    Standard of Review ........................................... 19

    A.     Padilla Is A Classic Battlefield Combatant Subject
          To Military Detention Under *Hamdi* ........................ 20

          1.     *Hamdi* controls this case and requires reversal
               of the district court's decision. ......................... 22

i

2.   The district court's locus-of-capture rule is mistaken and would create perverse results. . . . . . . . . . . . . . . . . . . . . . 24

3.   The district court's attempts to distinguish *Hamdi* are unavailing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

4.   The district court's construction of Congress's Authorization of Force is inconsistent with *Hamdi* and the plain terms and purposes of the AUMF. . . . . . . . . . . 30

B.   Padilla Fits Squarely Within The Category Of Citizens Subject To Detention As Enemy Combatants Under *Quirin* . . . . . 37

1.   This case is indistinguishable from *Quirin*. . . . . . . . . . . . . . 37

2.   Neither *Quirin* nor any other authority supports the district court's restrictive clear-statement rule. . . . . . . . 44

3.   Both *Hamdi* and *Quirin* make clear that the district court erred in holding that the President must either charge Padilla criminally or suspend the writ of habeas corpus. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

C.   Contrary To The District Court's Holding, The President Has Inherent Authority As Commander In Chief To Order Padilla's Detention As An Enemy Combatant . . . . . . . . 52

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

ii

# TABLE OF AUTHORITIES

**CASES:**

*Bishop* v. *Wood*, 426 U.S. 341 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bowen* v. *Massachusetts*, 487 U.S. 879 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Browder* v. *Director, Dep't of Corrections*, 434 U.S. 257 (1978) . . . . . . . . . . . . 2

*Campbell* v. *Clinton*, 203 F.3d 19 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . 35, 52, 53

*Catlin* v. *United States*, 324 U.S. 229 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Cohen* v. *De la Cruz*, 523 U.S. 213 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Colepaugh* v. *Looney*, 235 F.2d 429 (10th Cir. 1956) . . . . . . . . . . . . . . . . . . . . . 50

*Correa* v. *Thornburgh*, 901 F.2d 1166 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 25

*Dames & Moore* v. *Regan*, 453 U.S. 654 (1981) . . . . . . . . . . . . . . . . . . . . 36, 46, 47

*Duncan* v. *Kahanamoku*, 327 U.S. 304 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ex parte Endo*, 323 U.S. 283 (1944) . . . . . . . . . . . . . . . . . . . . . . . 14, 48, 49, 55, 56

*Fleming* v. *Page*, 50 U.S. (9 How.) 603 (1850) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Haig* v. *Agee*, 453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Hamdi* v. *Rumsfeld*, 124 S. Ct. 2633 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Johnson* v. *Eisentrager*, 339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Khalid* v. *Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) . . . . . . . . . . . 22, 33, 34, 36, 44

iii

*Ludecke* v. *Watkins*, 335 U.S. 160 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Maggard* v. *O'Connell*, 703 F.2d 1284 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . 20

*McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316 (1819) . . . . . . . . . . . . . . . . . . . 34

*Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) . . . . . . . . . . . . . . . . . . . . . . 14, 51, 56

*Nat'l Elec. Mfrs. Ass'n* v. *Gulf Underwriters Ins. Co.*, 162 F.3d 821
    (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Padilla* v. *Rumsfeld*, 352 F.3d 695 (2d Cir. 2003) . . . . . . . . . . . . . . . . 4, 49, 53, 54

*Padilla ex rel. Newman* v. *Rumsfeld*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002) . . 3, 4

*The Prize Cases*, 67 U.S. (2 Black) 635 (1862) . . . . . . . . . . . . . . . . . . 35, 43, 52, 53

*Public Citizen* v. *Dep't of Justice*, 491 U.S. 440 (1989) . . . . . . . . . . . . . . . . . . . . 56

*Ex parte Quirin*, 317 U.S. 1 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Ramdass* v. *Angelone*, 187 F.3d 396 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 21

*Reid* v. *Covert*, 354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Reves* v. *Ernst & Young*, 494 U.S. 56 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Rumsfeld* v. *Padilla*, 124 S. Ct. 2711 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Territo*, 156 F.2d 142 (9th Cir. 1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*The Three Friends*, 166 U.S. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States* v. *Kavazanjian*, 623 F.2d 730 (1st Cir. 1980) . . . . . . . . . . . . . . . . . 25

iv

*United States* v. *McDonald*, 265 F. 754 (E.D.N.Y. 1920) . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Pacheco-Medina*, 212 F.3d 1162 (9th Cir. 2000) . . . . . . . . . . . . 25

*Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952) . . . . . . . . 47, 53, 54

## STATUTES, REGULATIONS AND RULES:

*Authorization for Use of Military Force*, Pub. L. No. 107-40,
115 Stat. 224 (Sept. 18, 2001) (AUMF) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Detention, Treatment, and Trial of Certain Non-Citizens in the War
Against Terrorism*, 66 Fed. Reg. 57,833 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10 U.S.C. § 821 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 4001(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 4001(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2253(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

OTHER LEGISLATIVE AND REGULATORY AUTHORITIES:

Cong. Rec. H5660 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Cong. Rec. H5669 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

H.R. Rep. No. 116, 92d Cong., 1st Sess. 2 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Global Intelligence Challenges 2005, Meeting Long-Term Challenges with
a Long-Term Strategy: Testimony Before the Senate Select Committee
on Intelligence* (Feb. 16, 2005) (statement of Porter J. Goss) . . . . . . . . . 42, 43

MISCELLANEOUS:

Audrey Kurth Cronin, Congressional Research Service, *Al Qaeda
After the Iraq Conflict* (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

Ingrid Detter, *The Law of War* (2d ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Michael Dobbs, *Saboteurs: The Nazi Raid on America* (2004) . . . . . . . . . . . . . . . 39

Louis Fisher, Congressional Research Service, *Military Tribunals:
The Quirin Precedent* (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Douglas Jehl, *U.S. Aides Cite Worry on Qaeda Infiltration from Mexico*,
N.Y. Times, Feb. 17, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

No. 05-6396

IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

JOSE PADILLA,
PETITIONER-APPELLEE

v.

COMMANDER C.T. HANFT,
USN COMMANDER, CONSOLIDATED NAVAL BRIG,
RESPONDENT-APPELLANT

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

OPENING BRIEF FOR THE APPELLANT

JURISDICTIONAL STATEMENT

Respondent (hereinafter, the government) appeals from the district court's memorandum opinion and order, which grants Jose Padilla's petition for writ of habeas corpus and directs the government to release him or charge him with a crime. R. 48, Op. 23 & n.14, App. 183.[1] The district court's jurisdiction rested on 28 U.S.C.

---

[1] In citations to the record, the following abbreviations and denotations are used: "R." refers to the pertinent district court docket number; "App." refers to the

1

§§ 1331 and 2241, its opinion issued on February 28, 2005, and judgment was entered in Padilla's favor on March 4, 2005. *See* R. 49, App. 184. The government timely filed a notice of appeal on March 11, 2005. R. 50, App. 185. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a) because the district court's order is "final" for purposes of those provisions. *See Browder* v. *Director, Dep't of Corrections*, 434 U.S. 257, 260, 265-266 (1978) (district court's conditional order, which directed habeas petitioner's release unless State retried him within 60 days, was "final" under section 2253(a), "leaving nothing to be done but to enforce by execution what had been determined" (quoting *Catlin* v. *United States*, 324 U.S. 229, 236 (1945))).

### STATEMENT OF THE ISSUE

Whether the President has authority under the Constitution and Congress's Authorization for Use of Military Force enacted in the wake of the attacks of September 11, 2001, to order the military to detain Padilla as an enemy combatant,

---

joint appendix; "President's Order" refers to the President's June 9, 2002, order directing the Department of Defense (DoD) to detain Padilla as an enemy combatant; "Pet." refers to Padilla's July 2, 2004, habeas petition; "Rapp Dec." refers to the August 27, 2004, declaration of Jeffrey N. Rapp, the Director of the Joint Intelligence Task Force for Combating Terrorism, an agency within the DoD; "Mem." refers to the memorandum in support of Padilla's October 20, 2004, motion for summary judgment; and "Op." refers to the district court's February 28, 2005, opinion and order granting Padilla's petition via summary judgment.

based on the facts (assumed to be true at this stage of the proceedings) that Padilla trained with and was closely associated with al Qaeda both before and after September 11, 2001, engaged in armed conflict against the United States and allied forces in Afghanistan, and after eluding our forces in Afghanistan, accepted a mission from al Qaeda to enter the United States and carry out attacks on our citizens within our own borders.

## STATEMENT OF THE CASE

On May 8, 2002, Padilla was arrested in the secure customs area of Chicago's O'Hare International Airport pursuant to a material witness warrant issued in the United States District Court for the Southern District of New York in connection with grand jury proceedings investigating the September 11 attacks. On June 9, 2002, the President ordered the Department of Defense to detain Padilla as an enemy combatant. R. 23 (Ex. A), President's Order, App. 16. Padilla was then transferred to military control and taken to the Naval Consolidated Brig, Charleston, South Carolina, where he has since been detained.

On June 11, 2002, Padilla's counsel filed on his behalf a habeas corpus petition in the Southern District of New York. Rejecting the government's argument that the petition should have been filed in the District of South Carolina, the district court found that it had jurisdiction, *Padilla ex rel. Newman* v. *Rumsfeld*, 233 F. Supp. 2d

3

564, 575-587 (S.D.N.Y. 2002), but ultimately concluded on the merits that the President has legal authority to detain Padilla as an enemy combatant, *id*. at 587-599.

The United States Court of Appeals for the Second Circuit agreed that the Southern District of New York had jurisdiction. *Padilla* v. *Rumsfeld*, 352 F.3d 695, 702-710 (2d Cir. 2003). On the merits, the court held over a dissent that the President lacks authority to detain Padilla as an enemy combatant. *Compare id*. at 710-724 (majority opinion) *with id*. at 726-733 (Wesley, J., dissenting).

The Supreme Court granted the government's petition for writ of certiorari and held that the Southern District of New York lacked jurisdiction over the habeas petition and that the petition should have been filed in the District of South Carolina. *Rumsfeld v. Padilla*, 124 S. Ct. 2711, 2717-2727 (2004). Having found jurisdiction lacking, the Court did not reach the question whether the President has authority to detain Padilla as an enemy combatant. *Id*. at 2715.

On July 2, 2004, Padilla filed a habeas petition in the District of South Carolina, claiming, *inter alia*, that his detention violates the Constitution, R. 1, Pet. 4-5, ¶¶ 20-22, App. 10-11, as well as 18 U.S.C. § 4001(a), Pet. 5, ¶¶ 23-25, App. 11. On October 20, 2004, he moved for summary judgment on both of these counts. R. 35, Mem. 1-34. The district court granted his petition and motion on February 28, 2005, and ordered that he be released within 45 days. Op. 1-23, App. 161-183. The

4

government timely filed a notice of appeal on March 11, 2005, App. 185, and on the same day filed a motion for a stay of the court's release order pending appeal, *see* R. 51, App. 6. The district court granted the stay on April 6, 2005. R. 54, Order Granting Stay 1-2, App. 186-187.

## STATEMENT OF FACTS

### I.    The Attacks of September 11 and Congress's Authorization of Force

On September 11, 2001, the United States endured a foreign enemy attack more savage, deadly, and destructive than any sustained by the Nation on any one day in its history. That morning, members of the al Qaeda terrorist network hijacked four commercial airliners. The terrorists flew three of the aircraft into targets in the Nation's financial center and its seat of government. One crashed in a field in Pennsylvania due to the passengers' heroic resistance to the hijackers. The attacks killed approximately 3,000 persons, injured thousands more, destroyed billions of dollars in property, and exacted a heavy toll on the Nation's infrastructure and economy.

One week later, Congress enacted the Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, 115 Stat. 224 (2001), providing legislative support for the President's use of "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the

5

terrorist attacks that occurred on September 11, 2001, * * * in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." 115 Stat. 224, § 2(a). The AUMF specifically recognized the President's "authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States," and it emphasized that the forces responsible for the September 11 attacks "continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States," "render[ing] it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad." *Id.*, Preamble.

Soon after the AUMF's enactment, the President made it express that the September 11 attacks "created a state of armed conflict" with al Qaeda. Military Order of November 13, 2001: Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833, § 1(a). In the course of that armed conflict, the United States military has seized and detained numerous persons who were fighting for and associated with the enemy, including Padilla.

## II.    The Factual Basis for Padilla's Military Detention

In February 2000, while in Saudi Arabia on a religious pilgrimage, Padilla met with an al Qaeda recruiter and discussed al Qaeda training opportunities in

6

Afghanistan. R. 23 (Ex. B), Rapp Dec. ¶ 7, App. 19. In the summer of 2000, Padilla visited a Taliban safehouse in Quetta, Pakistan, a city near the Afghan border. Rapp Dec. ¶ 8, App. 19. From there, he crossed the border into Afghanistan in the company of Taliban operatives and other recruits to train for jihad near Kandahar. *Ibid.* In July 2000, he completed his training-camp application, using one of his aliases, Abdullah al Muhajir. *Ibid.* In September and October 2000, he attended the al Qaeda-affiliated al-Farouq training camp just north of Kandahar, where he learned how to use explosives, weapons, and camouflage, and where he also received training in land navigation and communications. *Ibid.* While at the camp, Padilla met several times with Mohammed Atef, a senior al Qaeda operative and military commander. *Ibid.* In the fall of 2000, after successfully completing the training, Padilla and several other new recruits spent three months just north of Kabul, Afghanistan, guarding what he understood to be a Taliban outpost. Rapp Dec. ¶ 8, App. 20. For this guard duty, Padilla was armed with a Kalashnikov assault rifle and ammunition. *Ibid.*

After spending the spring of 2001 in Egypt, Padilla returned in June 2001 to Quetta, Pakistan, where he stayed at an al Qaeda safehouse. Rapp Dec. ¶ 9, App. 20. Soon thereafter, he returned to Kandahar, where he met with Atef at another al Qaeda safehouse. Rapp Dec. ¶ 11, App. 21. Atef asked whether Padilla would undertake

7

a mission to blow up apartment buildings in the United States through the use of natural gas. *Ibid.* Padilla agreed and, accordingly, Atef sent him to an al Qaeda training camp near Kandahar, where he received further training from an al Qaeda explosives expert. *Ibid.* During this training, Padilla learned, among other things, how to prepare and seal an apartment in order to obtain the highest explosive yield and thereby inflict the largest number of civilian casualties. *Ibid.*

In the fall of 2001, Padilla was staying at an al Qaeda safehouse in or near Kandahar when he and his fellow al Qaeda operatives learned of the September 11 terrorist attacks. Rapp Dec. ¶ 9, App. 20. After the attacks, he spent much of his time with Atef at another al Qaeda safehouse in or near Kandahar. *Ibid.* When the United States commenced combat operations against the Taliban and al Qaeda, Padilla and the other operatives moved from safehouse to safehouse to avoid bombing or capture. *Ibid.* In November 2001, United States forces bombed the safehouse where Atef was staying. Rapp Dec. ¶ 10, App. 20. The attack killed Atef. *Ibid.* Padilla was staying at a different al Qaeda safehouse on that day, but he returned to assist in retrieving Atef's body from the rubble. *Ibid.*

After Atef was killed, Padilla and several other al Qaeda operatives began moving towards Afghanistan's mountainous border with Pakistan in order to evade United States forces and air strikes. Rapp Dec. ¶ 10, App. 20. Padilla was armed

8

with an assault rifle during this time. *Ibid.* After taking cover in a network of bunkers and caves near Khowst, Afghanistan, Padilla and the other operatives were escorted into Pakistan by Taliban personnel. Rapp Dec. ¶ 10, App. 21. Padilla crossed into Pakistan in January 2002. *Ibid.*

Soon after entering Pakistan, Padilla met with senior Osama bin Laden lieutenant Abu Zubaydah on two different occasions at safehouses in Lahore and Faisalabad. Rapp Dec. ¶ 10, App. 21. The two men discussed the possibility of conducting terrorist operations involving detonation of explosives within the United States. *Ibid.* Consistent with these discussions, Padilla conducted what he called "research" on the construction of an atomic bomb. *Ibid.*

In March 2002, Zubaydah sent Padilla and an accomplice to Karachi, Pakistan, to present the atomic bomb operation to Khalid Sheikh Mohammad (KSM), al Qaeda's operations leader. Rapp Dec. ¶ 12, App. 22. Zubaydah gave Padilla some money and wrote KSM a reference letter on Padilla's behalf. *Ibid.* KSM met with Padilla and his accomplice at an al Qaeda safehouse. *Ibid.* KSM believed that Padilla's atomic bomb plot was too complicated, but he suggested that Padilla and his accomplice revive the plan of using natural gas to blow up apartment buildings in the United States, as Padilla had originally discussed with Atef. *Ibid.* Padilla accepted the assignment, and KSM gave him full authority to conduct the operation if he and

9

his accomplice successfully entered the United States. *Ibid.*

Before departing for the United States, Padilla received training from Ramzi Bin al-Shibh, a senior al Qaeda operative, on the secure use of telephones and e-mail protocols. Rapp Dec. ¶ 12, App. 22. He also received $5,000 from KSM and an additional $10,000 from al Qaeda facilitator and planner Ammar al-Baluchi. *Ibid.* Finally, Padilla was supplied with travel documents, a cell phone, and an e-mail address to notify al-Baluchi of his arrival in the United States. *Ibid.* The night before his departure, Padilla attended dinner with KSM, al-Baluchi, and Bin al-Shibh. Rapp Dec. ¶ 12, App. 23.

On May 8, 2002, Padilla flew from Zurich, Switzerland, to Chicago's O'Hare International Airport. R. 37, Stipulations of Fact (Stipulations) ¶ 3, App. 93. He was monitored by Federal Bureau of Investigation (FBI) agents in the Zurich airport and while on the plane. After arriving in Chicago, he was detained in the secure customs inspection area, where Customs Inspectors and FBI agents interviewed him. Stipulations ¶¶ 6-8, App. 93. He initially submitted to questioning but eventually refused to continue the interview without legal representation. *Ibid.* The interviewing agents arrested him shortly thereafter pursuant to the material witness warrant issued by the District Court for the Southern District of New York. Stipulations ¶¶ 9-10, App. 93; *see supra* p. 3. Padilla was carrying $10,526 in U.S.

currency, the cell phone that he had been given by al Qaeda leaders in Pakistan, and al-Baluchi's e-mail address. Rapp Dec. ¶ 13, App. 23.

On June 9, 2002, the President—"as * * * Commander in Chief of the U.S. armed forces," and "[i]n accordance with the Constitution and consistent with the laws of the United States, including the [AUMF]"—made a formal determination that Padilla "is, and at the time he entered the United States in May 2002 was, an enemy combatant." President's Order ¶ 1, App. 16. The President found, in particular, that Padilla: is "closely associated with al Qaeda, an international terrorist organization with which the United States is at war," *id*. ¶ 2; has "engaged in * * * hostile and war-like acts, including conduct in preparation for acts of international terrorism" against the United States, *id*. ¶ 3; "possesses intelligence" about al Qaeda that "would aid U.S. efforts to prevent attacks by al Qaeda on the United States," *id*. ¶ 4; and "represents a continuing, present and grave danger to the national security of the United States," such that his detention "is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens," *id*. ¶ 5. The President thus directed the Secretary of Defense "to receive Mr. Padilla from the Department of Justice and to detain him as an enemy

11

combatant." *Ibid.*[2]

Immediately upon issuance of the President's Order, the Department of Justice moved the District Court for the Southern District of New York to vacate the material witness warrant, and the motion was granted. That same day, Padilla was transferred to military control and taken to the Naval Consolidated Brig, Charleston, South Carolina, where he has since been detained.

---

[2] The President's determination was the culmination of an extensive deliberative process within the Executive Branch involving several layers of review. *See* 150 Cong. Rec. S2701, S2703-S2704 (daily ed. Mar. 11, 2004) (reprinting Feb. 24, 2004, remarks of Alberto Gonzales, then Counsel to the President, before the American Bar Association's Standing Committee on Law and National Security). As outlined in those remarks, when a United States citizen is suspected of being an enemy combatant, the Office of Legal Counsel (OLC) makes an initial determination concerning whether the individual satisfies the legal standards for military detention as an enemy combatant. *See Ex parte Quirin*, 317 U.S. 1, 37-38 (1942). Following the OLC's determination, the Director of the Cental Intelligence Agency (CIA), based on all available intelligence, makes a recommendation to the DoD concerning whether the person should be detained as an enemy combatant. The Secretary of Defense makes his own assessment based on information provided by the CIA as well as other intelligence developed within the DoD; he then transmits his assessment to the Attorney General with a request for an opinion about whether the individual may be lawfully detained and whether such a course is recommended as a matter of policy. After the Attorney General confers with the Department of Justice's Criminal Division, the FBI, and the OLC, he submits his recommendation back to the Secretary of Defense, who then transmits all of the recommendations and intelligence information to the President. Finally, the President reviews all of the materials. If, as in this case, he determines that the individual should be detained as an enemy combatant, he executes a formal order to that effect. *See* 150 Cong. Rec. at S2704.

### III.    The District Court Proceedings

A.    In July 2004, Padilla filed a petition for writ of habeas corpus in the court below, claiming among other things that (1) his military detention violates the Constitution because American citizens arrested in the United States may be detained only pursuant to the criminal process (Count One), Pet. 4-5, ¶¶ 20-22, App. 10-11; *see* Mem. 22-34; and (2) his military detention violates 18 U.S.C. § 4001(a)—which provides that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress"—because the AUMF does not authorize the detention (Count Two), Pet. 5, ¶¶ 23-25, App. 11; *see* Mem. 16-22.  In October 2004, Padilla filed a motion for summary judgment, reiterating the legal claims set forth in his petition and arguing that he is "entitled to judgment as a matter of law even if all of the facts pleaded by the Executive [B]ranch are assumed to be true." Mem. 1 (citing Fed. R. Civ. P. 56(c)).

B.    In February 2005, the district court granted Padilla's motion for summary judgment and ordered that he be released from custody or charged with a crime.  Op. 23 & n.14.

1.    With respect to Count One of Padilla's habeas petition, the court concluded that the President lacks inherent authority under the Constitution to detain Padilla as an enemy combatant. Op. 16 ("[T]he detention of a United States citizen

13

by the military is disallowed without explicit Congressional authorization."); *see id.* at 19-21. In doing so, the court also suggested that, whatever the AUMF may authorize, the President may not militarily detain any citizen captured in the United States absent suspension of the writ of habeas corpus. Op. 22 ("Since Congress has not acted to suspend the writ, and neither the President nor this Court [has] the ability to do so, * * * [Padilla] must be released."); *see id.* at 14-16 (discussing *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866)).

2.     With respect to Count Two of Padilla's petition, the district court concluded that the AUMF does not authorize Padilla's military detention and that his detention therefore violates 18 U.S.C. § 4001(a). Op. 12-13, 16-19. More specifically, the court held that: Section 4001(a) "forbids *any* kind of detention of a[] United States citizen," including as an enemy combatant, "absent a congressional grant of authority to detain," Op. 16-17 (emphasis in original); *see id.* at 18-19; indeed, Section 4001(a) requires that a congressional act " 'clearly and unmistakably' grant[ ] the President * * * authority" to detain, Op. 17-18 (quoting *Ex parte Endo*, 323 U.S. 283, 300 (1944)); and, finally, the AUMF does not authorize the President to detain Padilla militarily because, unlike the detention of a citizen "who is captured on the battlefield," the detention of a citizen "arrested in a civilian setting such as a[] United States airport" is not a "necessary and appropriate use of force" within the

14

meaning of the AUMF, because the President could initiate criminal charges instead, Op. 17; *see id.* at 21-22 (rejecting President's conclusion that Padilla's military detention is "necessary to prevent him from aiding al Qaeda in its efforts to attack the United States"; stating that "this is a law enforcement matter, not a military matter"; and concluding that the normal use of the criminal process is sufficient to ensure the Nation's security).

### SUMMARY OF ARGUMENT

This appeal requires the Court to presume the truth of the government's factual submissions and to determine, based on those facts, whether the President as Commander in Chief during ongoing hostilities has the authority to detain Padilla as an enemy combatant. The President's authority to detain Padilla follows directly from the Supreme Court's decisions in both *Hamdi* v. *Rumsfeld*, 124 S. Ct. 2633 (2004), and *Ex parte Quirin*, 317 U.S. 1 (1942). As an al Qaeda affiliate who took up arms against United States forces on a foreign battlefield and then attempted to enter the United States intent on hostile and warlike acts, Padilla falls squarely within the authority to detain recognized by those decisions.

As the case comes to this Court, Padilla is an al Qaeda-trained operative, who, while armed with an assault rifle, evaded capture by United States troops on a foreign battlefield, and then after conspiring with senior al Qaeda operatives attempted to

15

return to the United States to carry out attacks on domestic soil. Those facts make Padilla a classic battlefield detainee subject to detention as an enemy combatant under *Hamdi* and *Quirin*.

1.     *Hamdi* makes clear that the AUMF's authorization to use "all necessary and appropriate force" against the "nations, organizations, or persons" associated with the September 11 attacks includes the "fundamental and accepted" power of the Commander in Chief to detain as enemy combatants individuals, regardless of citizenship, who associated with al Qaeda or Taliban forces and engaged in armed conflict against United States and coalition forces in Afghanistan. 124 S. Ct. at 2640. There is therefore no doubt after *Hamdi* that if Padilla had been captured in Afghanistan carrying his AK-47 with al Qaeda and Taliban forces before his escape into Pakistan and subsequent mission on behalf of al Qaeda to the United States, he—no less than Hamdi himself—would have been subject to detention as an enemy combatant. Padilla is "an individual who * * * was 'part of or supporting forces hostile to the United States or coalition partners' " in Afghanistan and who "'engaged in an armed conflict against the United States' there." 124 S. Ct. at 2639. Indeed, the only salient difference between Padilla's and Hamdi's tours of duty in Afghanistan is that while Hamdi's association was limited to the Taliban, Padilla not only associated with Taliban forces, but was also a trained al Qaeda operative.

16

2.    The fact that Padilla eluded capture in Afghanistan and then, at the direction and with the aid of al Qaeda, traveled here to continue hostile and war-like acts against the United States and its citizens does not diminish the President's authority to detain him as an enemy combatant. Both the Supreme Court's holding in *Quirin* and common sense confirm that Padilla's *additional* hostile act of traveling to the United States to carry out his violent mission on behalf of al Qaeda does not relieve him of his enemy combatant status. Instead, those further hostile acts place him not only within the definition employed in *Hamdi*, but also squarely within the definition of enemy combatants set forth in *Quirin*, namely "[c]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts." 317 U.S. at 37-38. In the war against terrorists of global reach, as the Nation learned all too well on September 11, 2001, the territory of the United States is part of the battlefield.

Nor is there any rational basis to conclude that Congress—in reacting to the worst attack on American soil in our history—would have intended to authorize the President to detain Padilla on the battlefield in Afghanistan, but to deny authorization if he eluded capture overseas and attempted to enter our Nation to renew his hostile and warlike acts here. Such a construction would defy all reason, finding no support in the Constitution, the AUMF's text, or judicial precedent, and would create truly

17

perverse incentives by rewarding al Qaeda operatives for attempting to enter our borders. Nor is there any support for the district court's related holding that the President's sole recourse in dealing with a citizen enemy combatant returning from a foreign battlefield to bring the battle to our domestic soil is to charge him criminally or release him. That approach garnered the votes of only two Justices in *Hamdi* and was expressly rejected by a majority of Justices in *Hamdi* and all of the Justices in *Quirin*.

3.    Finally, although the Court need not reach the issues, the district court erred in holding that the President lacks the inherent authority as Commander in Chief to detain Padilla as an enemy combatant and that 18 U.S.C. 4001(a) could and does restrain that authority. Neither the Constitution nor any act of Congress renders the Commander in Chief so enfeebled when the enemy seeks to bring the battle to our soil. The decision below should be reversed.

### ARGUMENT

## The President Has Authority Under The Constitution And Congress's Authorization Of Force To Detain Padilla As An Enemy Combatant Without Charging Him Criminally

The district court accepted Padilla's claims (Pet. 4-5, ¶¶ 20-25, App. 10-11) that his detention as an enemy combatant without criminal charges violates the Constitution, the AUMF, and Section 4001(a) because American citizens arrested in

18

the United States may be detained only pursuant to the criminal process. But the Supreme Court's decisions in *Hamdi* and *Quirin* reaffirm the military's long-settled authority—independent and distinct from the criminal process—to detain enemy combatants for the duration of a given armed conflict, including the current conflict against al Qaeda. Those decisions squarely apply to this case and fully support the President's authority to order Padilla's detention as an enemy combatant. Indeed, because the circumstances of Padilla's capture and detention place him squarely within both categories of citizens that the Supreme Court has recognized may be detained as enemy combatants in *Hamdi* and *Quirin*, this Court can uphold the President's authority to order Padilla's military detention without expanding in any way the definition of enemy combatants the Supreme Court employed in those cases. Accordingly, the district court's order granting Padilla's summary judgment motion and petition for writ of habeas corpus should be reversed.

### Standard of Review

The district court's grant of summary judgment is reviewed *de novo* and "this Court must construe all evidence and make all inferences in the light most favorable to [the government], the non-moving party." *E.g.*, *Nat'l Elec. Mfrs. Ass'n* v. *Gulf Underwriters Ins. Co.*, 162 F.3d 821, 824 (4th Cir. 1998); *ibid.* ("The district court's conclusion[s] of law * * * [are] subject to *de novo* review by this Court."). Because

19

Padilla does not dispute the factual basis of his detention for purposes of his summary judgment motion, the government's factual allegations are assumed to be true in this appeal. *Bishop* v. *Wood*, 426 U.S. 341, 347 (1976) (a reviewing court's "appraisal of [a non-movant's] claim * * * must accept his version of the facts [where] the District Court granted summary judgment against him"); *see Maggard* v. *O'Connell*, 703 F.2d 1284, 1290 (D.C. Cir. 1983) (even a "disputed factual allegation * * * is properly assumed to be true for purposes of judging the propriety of a grant of summary judgment for the other side").

### A.    Padilla Is A Classic Battlefield Combatant Subject To Military Detention Under *Hamdi*

The Supreme Court in *Hamdi* confirmed that the military may seize and detain enemy combatants for the duration of the conflict with al Qaeda. The decision upheld the President's authority, under the AUMF, to detain as an enemy combatant a presumed American citizen who "was 'part of or supporting forces hostile to the United States or coalition partners' in Afghanistan and who 'engaged in an armed conflict against the United States' there." 124 S. Ct. at 2639 (plurality opinion); *accord id.* at 2679 (Thomas, J., dissenting) (agreeing that AUMF authorized detention). As the controlling opinion explained, the "capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal

20

agreement and practice,' are 'important incident[s] of war.' " *Id.* at 2640 (plurality)

(quoting *Quirin*, 317 U.S. at 28); *accord id.* at 2679 (Thomas, J., dissenting); *see also*

*Johnson* v. *Eisentrager*, 339 U.S. 763, 786 (1950) ("This Court has characterized as

'well-established' the 'power of the military to exercise jurisdiction over * * * enemy

belligerents [and] prisoners of war[.]' " (quoting *Duncan* v. *Kahanamoku*, 327 U.S.

304, 313 (1946))).[3]  Such military detention is distinct from the criminal justice

system and is not for the purpose of imposing criminal or other punishment, but

instead serves to "prevent captured individuals from returning to the field of battle

and taking up arms once again." *Hamdi*, 124 S. Ct. at 2640 (plurality).

Because this sort of preventive detention "is a fundamental incident of waging

war," the *Hamdi* Court held, "it is of no moment that the AUMF does not use specific

language of detention." 124 S. Ct. at 2641 (plurality); *see id.* at 2679 (Thomas, J.,

dissenting).  Rather, "Congress' grant of authority for the use of 'necessary and

---

[3] The plurality opinion of Justice O'Connor in *Hamdi* is the controlling opinion with respect to the President's authority to detain enemy combatants because Justice Thomas would have upheld the President's authority on even more deferential grounds (and Justices Souter and Ginsburg, although disagreeing with much of the plurality's analysis of the authority to detain, joined with the plurality in order to create a majority for disposition of the case). *See Hamdi*, 124 S. Ct. at 2660 (Souter, J., concurring); *id.* at 2674-2685 (Thomas, J., dissenting); *Ramdass* v. *Angelone*, 187 F.3d 396, 403 (4th Cir. 1999) ("We recognize Justice O'Connor's concurrence as the controlling opinion in *Simmons* because it represents the narrowest grounds upon which a majority of the Court agreed.").

21

appropriate force' * * * include[s] the authority to detain for the duration of the

relevant conflict," an "understanding * * * based on longstanding law-of-war

principles." *Id.* at 2641 (plurality); *see id.* at 2679 (Thomas, J., dissenting). Thus, it

is clear after *Hamdi* that the President has authority pursuant to the AUMF to detain

enemy combatants for the duration of the current conflict against al Qaeda. *See*

*Khalid* v. *Bush*, 355 F. Supp. 2d 311, 319 (D.D.C. 2005) (holding that Supreme Court

in *Hamdi* "interpreted the AUMF to mean that Congress has granted the President

the authority to detain enemy combatants for the duration of the current conflict").[4]

### 1. *Hamdi* controls this case and requires reversal of the district court's decision.

Padilla's combat activities in Afghanistan are not materially distinguishable

from Hamdi's and so Padilla fits squarely within the enemy-combatant definition that

---

[4] *Hamdi*'s conclusion that the AUMF encompasses the detention of a Taliban combatant applies *a fortiori* to al Qaeda combatants like Padilla. *Khalid*, 355 F. Supp. 2d at 315 n.2. As *Hamdi*'s controlling opinion explains, "[t]here can be no doubt that individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported *the al Qaeda terrorist network responsible for [the September 11] attacks*, are individuals Congress sought to target in passing the AUMF." 124 S. Ct. at 2640 (emphasis added). There could be even less doubt that Congress in the AUMF sought to target combatants for al Qaeda, given that al Qaeda was directly responsible for the September 11 attacks. 115 Stat. 224, § 2(a); *see* President's Order ¶ 2, App. 16 (stating that "al Qaeda" is "an international terrorist organization with which the United States is at war"); *see also Khalid*, 355 F. Supp. 2d at 319 (the AUMF "in effect * * * gave the President the power to capture and detain those who the military determined were either responsible for the 9/11 attacks or posed a threat of future terrorist attacks").

the Supreme Court utilized in *Hamdi*. The *Hamdi* Court emphasized that it was not

fixing the outer limits of the class of enemy combatants, *see* 124 S. Ct. at 2642 n.1,

but was considering only whether a narrow class of citizens was subject to military

detention, stating at the outset that

> for purposes of this case, the "enemy combatant" that [the government]
> is seeking to detain is an individual who, it alleges, was "part of or
> supporting forces hostile to the United States or coalition partners" in
> Afghanistan and who "engaged in an armed conflict against the United
> States" there. * * * We therefore answer only * * * whether the
> detention of citizens falling within that definition is authorized.

*Hamdi*, 124 S. Ct. at 2639 (plurality). Padilla, no less than Hamdi, meets that

definition.

Just like Hamdi, Padilla was " 'part of or supporting forces hostile to the United

States or coalition partners' in Afghanistan," and he " 'engaged in an armed conflict

against the United States' there." As established by the declaration attached to the

government's answer to the habeas petition (Rapp Dec. ¶¶ 9-10, App. 20-21), Padilla,

just like Hamdi, carried an  assault rifle while affiliated with Taliban and al Qaeda

forces in Afghanistan during the time that the United States and its coalition partners

were engaged in armed conflict against those forces. Padilla therefore is precisely the

kind of traditional battlefield combatant that the Court in *Hamdi* held has always been

subject to military detention during wartime and that Congress necessarily intended

23

to reach when it authorized the President to use "all necessary and appropriate force" against al Qaeda and its supporters.

> **2. The district court's locus-of-capture rule is mistaken and would create perverse results.**

There is no doubt that if Padilla had been captured while in Afghanistan associating with al Qaeda and Taliban forces, he would be subject to military detention as an enemy combatant, notwithstanding his status as a United States citizen. The only question remaining is whether Padilla, by eluding our forces in Afghanistan and accepting a mission on behalf of al Qaeda to travel to the United States to continue his hostile and warlike acts against our Nation within our own borders, somehow relieved himself of the status of his enemy combatancy or otherwise immunized himself from detention by the military.

Remarkably, the district court answered that question in the affirmative. It held that the locus of capture is determinative of the President's authority to order military detention. As discussed in more detail below, there is no support in either law or logic for that holding, which, among other things, disregards Congress's express finding in the AUMF that the September 11 attacks made it both "necessary and appropriate" to use force to protect our citizens "both at home and abroad," 115 Stat. 224, Preamble, and creates truly perverse incentives by rewarding al Qaeda

24

combatants for attempting to enter the United States to attack our citizens at home.[5]

But in addition to those other flaws, the district court's treatment of place of capture as determinative of the President's authority is flatly at odds with the Supreme Court's decision in *Hamdi*. Nothing in *Hamdi*'s definition of enemy combatant turned on the locus of capture. Instead, the plurality emphasized that it was defining the term enemy combatant for purposes of that case as "an individual

---

[5] Although Padilla may not have been captured in a "foreign combat zone," Op. 11, both he and the district court have erred in blithely equating his detention in the secure customs area at O'Hare with a garden-variety arrest "in" the United States. *E.g., id.* at 11-12 n.9; *see also, e.g.,* Mem. i, 2, 5, 6, 7, 8, 15, 16, 23 n.18, 27, 34. In the immigration context, for example, it is well settled that mere presence within the Nation's borders is not the same as "entry" into the United States and that " 'entry' is not accomplished until physical presence * * * is accompanied by freedom from official restraint." *United States* v. *Kavazanjian*, 623 F.2d 730, 736-738 (1st Cir. 1980); *see also, e.g., United States* v. *Pacheco-Medina*, 212 F.3d 1162, 1163-1166 (9th Cir. 2000); *Correa* v. *Thornburgh*, 901 F.2d 1166, 1171-1172 (2d Cir. 1990). Padilla, of course, was never free from official restraint. He was surveilled in Zurich and on the plane en route to the United States. Under the district court's logic, the President might well have had the authority to detain Padilla before takeoff but lost that authority once the plane landed. That logic creates the twin perverse incentives to arrest someone like Padilla abroad where there may be considerable logistical, safety, and diplomatic difficulties and to reward someone like Padilla for getting closer to his target. Once his plane landed, he was stopped and arrested before he left the secure customs inspection area. *See* Stipulations ¶¶ 6-10, App. 93. He was never permitted to join the general public. In this respect, Padilla's case parallels *Correa*, where the habeas petitioner "was arguably 'inspect[ed]' and 'admit[ted]' by an immigration officer" but "was never free from official restraint" because she "remained in a restricted area, known as the 'Customs Enclosure,' where access and egress were controlled by exit control officers, and by Customs." 901 F.2d at 1171-1172.

25

who * * * was 'part of or supporting forces hostile to the United States or coalition partners' in Afghanistan and who 'engaged in an armed conflict against the United States' there." 124 S. Ct. at 2639. Thus, without any reference to the locus of capture, the plurality concluded that "[t]here can be no doubt that individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for [the September 11] attacks, are individuals Congress sought to target in passing the AUMF." *Id.* at 2640. Similarly, in noting that it was not attempting to define the permissible bounds of the term "enemy combatant," the plurality emphasized that "[h]ere, the basis asserted for detention by the military is that Hamdi was carrying a weapon against American troops on a foreign battlefield; that is, that he was an enemy combatant," *id.* at 2642 n.1, and again made no mention of place of capture.

The plurality emphasized, moreover, that the purpose of detaining enemy combatants during wartime is to prevent them from returning to battle and taking up arms once again. *Hamdi*, 124 S. Ct. at 2640. Nothing about that purpose supports drawing a distinction based on the locus of capture, especially in light of the nature of the current engagement. Given the current conflict and the September 11 attacks that led to the AUMF, an al Qaeda combatant captured attempting to enter the United States to commit hostile acts against our citizens at home poses an even greater threat

26

(and one even more squarely within the contemplation of Congress in enacting the AUMF) than one captured on a foreign battlefield. It is therefore no surprise that the plurality in *Hamdi* made no mention whatsoever of the locus of capture in discussing the preventive purpose of detaining enemy combatants. Instead, the plurality reasoned that "[a] citizen, no less than an alien, can be 'part of or supporting forces hostile to the United States or coalition partners' and 'engaged in an armed conflict against the United States,'" and that "such a citizen, if released, would pose the same threat of returning to the front during the ongoing conflict." *Id.* at 2640-2641. That is necessarily true whether that citizen is captured on the battlefield in Afghanistan or attempting to include Chicago in the domestic front of the war on terror.

Moreover, in concluding that a citizen who was "'part of or supporting forces hostile to the United States or coalition partners' in Afghanistan and who 'engaged in an armed conflict against the United States' there" is subject to detention as an enemy combatant, 124 S. Ct. at 2639 (plurality opinion), the Supreme Court relied heavily on traditional principles governing the law of war, *see id.* at 2640-2642. Those same principles make clear that once Padilla engaged in armed conflict against our forces in Afghanistan, he was subject to detention as an enemy combatant during the pendency of the relevant conflict, regardless of the locus of his capture. As a general matter, once an individual has engaged in armed conflict as part of enemy

27

forces, he is subject to preventive detention as an enemy combatant during the pendency of the relevant conflict, unless he has permanently laid down his weapons and returned to the civilian population. *See generally* Ingrid Detter, *The Law of War* 287 (2d ed. 2000). Padilla's actions do not evince any effort on his part to sever his ties to al Qaeda or permanently remove himself from the battle. To the contrary, as the case comes to this Court, Padilla conspired with senior al Qaeda leaders and then agreed to bring the battle to the United States. Those actions constitute additional unlawful belligerent acts that provide an independent basis to detain him. *See Quirin*, 317 U.S. at 30-38. That is particularly true in the context of the current conflict, where we fight an unconventional enemy whose efforts to carry out savage attacks on our citizens and our interests are not limited by international boundaries or borders. Long-accepted principles of the law of war confirm that Padilla's detention is justified by his hostile acts abroad and that there is no legitimate basis for distinguishing between him and Hamdi for purposes of the President's authority to detain. The detention of both individuals during the pendency of the current conflict is plainly authorized by both the Constitution and the AUMF.

28

### 3. The district court's attempts to distinguish *Hamdi* are unavailing.

The district court's analysis of the Supreme Court's decision in *Hamdi* was cursory at best. It emphasized, for example, that the controlling opinion "noted at least nine * * * times that the Court's holding that Mr. Hamdi's detention as an enemy combatant was constitutionally permissible was limited to the facts of that case." Op. 11 n.8. But it failed to recognize that in each of those instances, the *Hamdi* plurality was plainly referring to the narrow category of citizens that it had defined at the outset of its opinion *without regard to the place of capture* — namely, citizens who, precisely like Padilla, were " 'part of or supporting forces hostile to the United States or coalition partners' in Afghanistan and who 'engaged in armed conflict against the United States' there." 124 S.Ct. at 2639. Nor did the district court articulate a single plausible reason why the law of war or the AUMF should be read to reward classic battlefield combatants like Hamdi and Padilla if they undertake the further hostile acts of traveling to the United States to attack our citizens at home.

Instead, the district court took misplaced comfort in the fact that Judge Wilkinson in his concurring opinion in *Hamdi* v. *Rumsfeld*, 337 F.3d 335 (4th Cir. 2003), stated that "[t]o compare [Hamdi's] battlefield capture to the domestic arrest in *Padilla* v. *Rumsfeld* is to compare apples and oranges." *Id*. at 344. At the time of

29

Judge Wilkinson's statement, however, the record in the *Padilla* case then pending in federal court in New York contained no reference to the fact that Padilla, just like Hamdi, engaged in armed conflict against our forces in Afghanistan. That evidence was submitted for the first time in this case in the district court below, and it is that record that this Court must now assume is true for purposes of this appeal. That record makes clear that any relevant difference between Padilla and Hamdi (*e.g.*, that the former was affiliated with *both* al Qaeda and the Taliban and that the he escaped capture in Afghanistan and attempted to bring the battle to United States soil) only strengthens the President's authority to detain Padilla.

> **4.    The district court's construction of Congress's Authorization of Force is inconsistent with *Hamdi* and the plain terms and purposes of the AUMF.**

The Supreme Court in *Hamdi* concluded that the AUMF authorized the military detention of Hamdi, an American citizen, and that it thus satisfied any requirement that detention of a citizen be "pursuant to an Act of Congress" under Section 4001(a). 124 S. Ct. at 2639-2640 (plurality); *id*. at 2679 (Thomas, J., dissenting).[6] The district court distinguished *Hamdi* by reasoning (*e.g.*, Op. 11-12; *see id*. at 21-22) that the AUMF does not authorize detention of persons "captured in the United States"

---

[6] The Court reserved the question of whether Section 4001(a) reached military detentions by finding that the AUMF satisfied the provision assuming *arguendo* that it applied. *Hamdi*, 124 S. Ct. at 2639-2640 (plurality).

because, contrary to the President's explicit determination, such detention is not "necessary and appropriate" within the meaning of the statute. The court's conclusion rests on an unsupportable reading of the AUMF and represents a breathtaking judicial intrusion into the core Executive function of determining strategically how best to conduct a war.

a.    The AUMF specifically recognizes the President's constitutional authority "to take action to deter and prevent acts of international terrorism." 115 Stat. 224, Preamble. It broadly authorizes the President "to use *all* necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001 * * * in order to prevent *any* future acts of international terrorism against the United States by such nations, organizations or persons." *Id.*, § 2(a) (emphases added). Nothing in that sweeping grant of authority was designed implicitly to restrict the President's powers or in any way distinguishes between enemy combatants seized abroad and those seized on United States soil.

To the contrary, in enacting the AUMF, Congress was directly responding to attacks *on the United States homeland*, launched a week earlier by combatants who were *within the Nation's borders*. Congress's manifest purpose was to authorize actions to prevent another September 11. *See* 115 Stat. 224, § 2(a). To that end,

31

Congress expressly determined that the September 11 attacks "render it *both*
*necessary and appropriate* that the United States exercise its rights to self-defense
and to protect United States citizens *both at home and abroad.*" *Id.*, Preamble
(emphases added). Accordingly, neither the AUMF in general, nor its "necessary and
appropriate" language in particular, can plausibly be read to authorize detentions
abroad while simultaneously withholding support for the detention of combatants
found within the United States — *i.e.*, combatants identically situated to those who
carried out the September 11 attacks. *See Reves* v. *Ernst & Young*, 494 U.S. 56, 63
(1990) (a statute "must be understood against the backdrop of what Congress was
attempting to accomplish in enacting" it). The Supreme Court in *Hamdi* rejected the
argument that this authority did not extend to citizens. Given that fact, it is utterly
untenable to conclude, as did the district court, that the week after the September 11
attacks Congress authorized the detention of enemy combatants, without regard to
citizenship, only on foreign battlefields and not when they evade capture abroad and
seek to make the United States itself a battlefield, as it was on September 11.

Additionally, as discussed in more detail in Part B, *infra*, Congress was acting
against the backdrop of *Quirin*, which had long before established that the military's
authority to seize and detain enemy combatants fully applies to combatants—again
without regard to citizenship—who are arrested, unarmed, in civilian contexts within

32

the United States. *See Bowen* v. *Massachusetts*, 487 U.S. 879, 896 (1988) (noting the

"well-established presumption that Congress understands the state of existing law

when it legislates"). The AUMF gives no indication that Congress intended to depart

from that settled understanding, *see Cohen* v. *De la Cruz*, 523 U.S. 213, 221 (1998)

(courts "will not read [a statute] to erode past * * * practice absent a clear indication

that Congress intended such a departure" (quotation omitted)), and the nature of the

September 11 attacks and Congress's manifest intent to avoid future similar attacks

foreclose any such interpretation.[7]

Consistent with the foregoing analysis, one district court recently concluded

that the locus of a combatant's capture "is of no legal significance" under the AUMF

because the statute "does not place geographic parameters on the President's authority

to wage this war against terrorists." *Khalid*, 355 F. Supp. 2d at 320. As that court

explained, "[a]ny interpretation of the AUMF that would require the President and the

military to restrict their search, capture, and detention to the battlefields of

Afghanistan would contradict Congress's clear intention, and unduly hinder * * * the

---

[7] The debates in Congress reflect the understanding that the President may be required to take action against the enemy within the Nation's borders. *See* Cong. Rec. H5660 (Sept. 14, 2001) ("This will be a battle unlike any other, fought with new tools and methods; fought with intelligence and brute force, rooting out the enemies among us and those outside our borders.") (Rep. Menendez); H5669 ("We are facing a different kind of war requiring a different kind of response. We will need more vigilance at home and more cooperation abroad.") (Rep. Velasquez).

President's ability to protect our country from future acts of terrorism." *Ibid.* Thus, "to interpret the AUMF [in that fashion] would make a mockery of Congress's intent, contradict the President's necessary and natural war powers, and improperly narrow the Supreme Court's ruling in *Hamdi*." *Ibid.*

b.    While invoking the notion that "great deference is afforded the President's exercise of his authority as Commander-in-Chief," Op. 19 (quotation omitted), the district court invaded the Executive's prerogative to decide what is tactically "necessary and appropriate" to defeat al Qaeda in the current conflict. Specifically, the court concluded that while "the President's use of force to capture Mr. Hamdi was necessary and appropriate," "that same use of force was not" strategically necessary here "because the criminal justice system provides for [civilian] detention." Op. 12; *see id.* at 21 ("[T]his country's laws amply provide for the investigation, detention and prosecution of citizen * * * terrorists[.]"). That reading of the AUMF suffers from multiple defects. It reads language of authorization as an implicit limitation; it ignores the reality that the AUMF's other use of the phrase "necessary and appropriate" expressly references the need for protection "at home and abroad"; it neglects nearly 200 years of constitutional history during which phrases like "necessary and appropriate" have been read broadly, *see, e.g., McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819); and it fails to

34

provide any basis for distinction, because both Hamdi and the *Quirin* saboteurs could also have been prosecuted criminally.

The district court's reading of the AUMF also ignores the equally entrenched principle that "[a]s commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at *his* command, and to employ them in the manner *he* may deem most effective to harass and conquer and subdue the enemy." *Fleming* v. *Page*, 50 U.S. (9 How.) 603, 615 (1850) (emphases added). The President has a special duty and authority to respond when the Nation itself comes under attack. In that situation, "the President is not only authorized but bound to resist force by force." *The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862). "He must determine what degree of force the crisis demands." *Id.* at 670. In short, "the President has independent authority to repel aggressive acts by third parties even without specific congressional authorization, and courts may not review the level of force selected." *Campbell* v. *Clinton*, 203 F.3d 19, 27 (D.C. Cir.) (Silberman, J., concurring), *cert. denied*, 531 U.S. 815 (2000).

Finally, even if the AUMF left any doubt about whether Padilla's detention is "necessary and appropriate"—although Congress could hardly have been clearer that it is "necessary and appropriate that the United States exercise its rights to *self*-defense and to protect United States citizens both *at home* and abroad," 115 Stat. 224,

35

Preamble (emphases added)—the district court should have resolved such doubt not by undertaking its own unprecedented and ill-informed assessment of the necessities of the war but by deferring to the President's determination that Padilla's detention was necessary, appropriate, and therefore authorized. President's Order, Preamble, App. 16 (declaring that Padilla's detention is "consistent with the laws of the United States, including the Authorization for Use of Military Force"). Congressional authorizations of Executive action in the areas of foreign policy and national security must be read broadly, especially where, as here, the President enjoys his own constitutional authority. *See Khalid*, 355 F. Supp. 2d at 318 ("The President's ability to make the decisions necessary to effectively prosecute a Congressionally authorized armed conflict must be interpreted expansively."). As the Supreme Court has explained, "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take," and "[s]uch failure of Congress * * * does not, 'especially * * * in the areas of foreign policy and national security,' imply 'congressional disapproval' of action taken by the Executive." *Dames & Moore* v. *Regan*, 453 U.S. 654, 678 (1981) (quoting *Haig* v. *Agee*, 453 U.S. 280, 291 (1981)).

36

**B.    Padilla Fits Squarely Within The Category Of Citizens Subject To Detention As Enemy Combatants Under *Quirin***

The decision below accepts that the *Hamdi* Court found that the AUMF authorizes the detention of enemy combatants without regard to citizenship but nonetheless draws a distinction based on the locus of capture that is irreconcilable with the text and purpose of the AUMF. That would be remarkable enough, even if the Supreme Court had never decided *Quirin*, let alone reaffirmed it in *Hamdi*. But the district court's focus on the location of capture only highlights that Padilla's decisions to conspire with top al Qaeda leaders and to return to the United States to renew the battle on domestic soil, far from disqualifying him from detention under *Hamdi*, independently justify his detention under *Quirin*.

**1.    This case is indistinguishable from *Quirin*.**

In *Quirin*, the Supreme Court upheld the President's assertion of military control over a group of German combatants who were seized by FBI agents in the United States before carrying out plans to sabotage domestic war facilities during World War II. At least one of the saboteurs, Haupt, was a presumed American citizen, *see* 317 U.S. at 20, and all of the saboteurs had undergone training in Germany on the use of explosives. The President appointed a military commission to try the combatants for violating the laws of war, whereupon the FBI transferred

37

custody over them to the military. *See id.* at 22-23. The Supreme Court unanimously upheld the President's authority in those circumstances to treat an American citizen as an enemy combatant. The Court explained: "Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of * * * the law of war." *Id.* at 37-38.

Contrary to the district court's belief (Op. 13) that Padilla's case is "starkly different" from *Quirin*, the two cases are indistinguishable in all material respects. In *Quirin*, the saboteurs were affiliated with German forces during World War II, received explosives training in Germany, and came to the United States with plans to destroy domestic targets. 317 U.S. at 21. In the instant case, Padilla was closely associated with al Qaeda after September 11, 2001, received explosives training at al Qaeda training camps, and then came to the United States at al Qaeda's direction and with its assistance to advance the conduct of further attacks against the United States.[8]

It is immaterial that Padilla alleges (Pet. 3, ¶ 16, App. 9) that he "has never joined a foreign Army," was "arrested in a civilian setting," and "carried no weapons

---

[8] Also like the *Quirin* saboteurs—who received from the German government "substantial sums in United States currency, which were in their possession when arrested," 317 U.S. at 21-22—Padilla received $15,000 from senior al Qaeda operatives and was carrying over $10,000 when arrested. *See* Rapp Dec. ¶¶ 12-13, App. 22-23.

or explosives" at the time of his capture. Of the *Quirin* saboteurs, "only two of them, Burger and Neubauer, were formally enrolled in the German army." Michael Dobbs, *Saboteurs: The Nazi Raid on America* 204 (2004). The saboteurs, like Padilla, were recruited because of their ability to assimilate into the United States to effectuate plans of sabotage, and, whether or not formally inducted into military service, received explosives training at the hands of the enemy. The Court in *Quirin* thus did not rest its decision on the formal status of the saboteurs, but rather on the fact that they were "a part of *or associated with* the armed forces of the enemy." 317 U.S. at 45 (emphasis added); *see Hamdi*, 124 S. Ct. at 2639-2640 (plurality) (holding that an individual who is, *inter alia*, "part of *or supporting* forces hostile to the United States" is an enemy combatant (emphasis added)). There can be no doubt that a person who stays at al Qaeda safehouses, travels with other al Qaeda operatives while armed with an assault rifle in an effort to evade United States forces, meets repeatedly with senior al Qaeda operatives to discuss the conduct of terrorist operations on al Qaeda's behalf, and applies for and receives explosives training from al Qaeda operatives at the direction of al Qaeda leaders, is sufficiently associated with al Qaeda by any measure to qualify as an enemy combatant.[9]

---

[9] Any questions concerning formal membership are especially irrelevant in the context of al Qaeda because "[a]l Qaeda has no clear membership standards." Audrey Kurth Cronin, Congressional Research Service, *Al Qaeda After the Iraq Conflict* 3

The circumstances surrounding Padilla's initial seizure upon arriving in Chicago likewise are indistinguishable from those in *Quirin*. The *Quirin* saboteurs were seized by civilian authorities in Chicago and New York before the President later ordered their transfer to military control. 317 U.S. at 21-23; *see* Louis Fisher, Congressional Research Service, *Military Tribunals: The* Quirin *Precedent* 2 (2002) (noting that at least two of the saboteurs, Dasch and Burger, were arrested in their respective hotels in Washington and New York), *available at* <http://www.fas.org/irp/crs/RL31340.pdf>. Moreover, the *Quirin* Court rejected any suggestion that the saboteurs were "any the less belligerents if, as they argue, they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations." 317 U.S. at 38; *see United States* v. *McDonald*, 265 F. 754, 764 (E.D.N.Y. 1920) ("With the progress made in obtaining ways and means for devastation and destruction, the territory of the United States was certainly within the field of active operations."), *appeal dismissed*, 256 U.S. 705 (1921). And while Padilla was not carrying explosives when he was seized, the *Quirin* saboteurs likewise were not armed with explosives when arrested because

---

n.10 (2003), *available at* <http://www.fas.org/irp/crs/RS21529.pdf>; *cf. Reid* v. *Covert*, 354 U.S. 1, 22-23 (1957) (plurality opinion) ("We recognize that there might be circumstances where a person could be 'in' the armed services * * * even though he had not formally been inducted into the military or did not wear a uniform.").

40

they had buried their explosives upon coming ashore in the United States. 317 U.S. at 21.

Given these factual parallels—as well as the President's determination that Padilla is "closely associated with al Qaeda" and has "engaged in * * * hostile and war-like acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States," President's Order ¶¶ 2-3, App. 16—there can be no doubt that Padilla falls squarely within *Quirin*'s core holding: "Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of * * * the law of war." 317 U.S. at 37-38.

Nor can *Quirin* be distinguished based on any of the supposed factual differences asserted by the district court. Op. 14 n.10.

The fact that Padilla has not been "charged with a [law-of-war violation] and tried by a military tribunal" as were Haupt and the other *Quirin* saboteurs, Op. 14 n.10 (subheadings 1 and 3), is beside the point under *Hamdi*, as is the related fact that Padilla's detention is preventive rather than punitive, *ibid.* (subheading 2). As the plurality explained in *Hamdi*, "[w]hile Haupt was tried for violations of the law of war, nothing in *Quirin* suggests that his citizenship would have precluded his mere

41

detention for the duration of the relevant hostilities. * * * Nor can we see any reason for drawing such a line here." 124 S. Ct. at 2640-2641 (citations omitted).

Nor does it matter that *Quirin* preceded the enactment of 18 U.S.C. § 4001(a). Op. 14 n.10 (subheading 4). Even if Section 4001(a) applied to Padilla's military detention—and it does not, *see infra* pp. 54-56—it would prohibit such detention only in the absence of the congressional authorization that is clearly provided in the AUMF, *see supra* pp. 30-36; *see also Hamdi*, 124 S. Ct. at 2639-2640 (plurality) (relying on *Quirin*).

It is equally clear that *Quirin* cannot properly be distinguished on the ground that World War II "had a definite ending date," whereas the conflict against al Qaeda does not. Op. 14 n.10 (subheading 5). At the time *Quirin* was decided in July 1942, World War II had no "definite ending date." Yet that fact did not deter the Court from upholding the President's authority to exercise military jurisdiction over the saboteurs. The *Hamdi* Court made clear that "indefinite detention" refers to detentions that continue beyond the "duration of the relevant conflict." 124 S. Ct. at 2641. Padilla has not suggested, and the district court did not conclude, that the relevant conflict against al Qaeda has ended, and all available evidence is to the contrary. *See Global Intelligence Challenges 2005, Meeting Long-Term Challenges with a Long-Term Strategy: Testimony Before the Senate Select Committee on*

42

*Intelligence* (Feb. 16, 2005) (statement of Porter J. Goss) (testifying that al Qaeda remains "intent on finding ways to circumvent U.S. security enhancements to strike Americans and the [h]omeland," and that "[i]t may be only a matter of time before [al Qaeda] or another group attempts to use chemical, biological, radiological, and nuclear weapons"), *available at* <http://www.cia.gov/cia/public_affairs/speeches/ 2004/Goss_testimony_02162005.html>; *see also* Douglas Jehl, *U.S. Aides Cite Worry on Qaeda Infiltration from Mexico*, N.Y. Times, Feb. 17, 2005, at A16 (citing testimony of CIA Director Goss, FBI Director Robert S. Mueller, and Deputy Secretary of Homeland Security Admiral James M. Loy), *available at* 2005 WLNR 2228311. Nor has Padilla claimed, let alone cited authority for the notion, that his detention of 35 months is impermissibly "indefinite." Accordingly—and because the existence *vel non* of a state of armed conflict is a political question for the President, not the courts, to decide, *see Ludecke* v. *Watkins*, 335 U.S. 160, 170 (1948); *see also The Three Friends*, 166 U.S. 1, 63 (1897); *The Prize Cases*, 67 U.S. at 670—it is sufficient for present purposes that the President expressly determined immediately following the September 11 attacks that the country is at war with al Qaeda, *see supra* p. 6, and that he has not yet declared an end to those hostilities.[10]

---

[10] Responding to several combatants' concerns "at the prospect of indefinite or perpetual detention," one district court recently and properly recognized that "[i]f the current conflict continues for an unacceptable duration [and] inadequacies in the

**2.    Neither *Quirin* nor any other authority supports the district court's restrictive clear-statement rule.**

The district court also attempted to distinguish *Quirin* on the ground that "the *Quirin* Court's decision to uphold military jurisdiction rested on * * * express congressional authorization," whereas in this case "no such [c]ongressional authorization is present." Op. 13-14. In other words, the court read *Quirin* as imposing a clear-statement requirement for congressional authorization that was satisfied by the Articles of War in *Quirin*, but not by the AUMF here. That conclusion is mistaken for two reasons.

First, for the reasons explained in Part A, *supra*, the AUMF does in fact provide sufficiently clear congressional authorization for Padilla's military detention, and, accordingly, *Quirin* cannot be explained away on that basis. The *Hamdi* Court expressly found that the broad grant of authority in the AUMF for the President's use of "all necessary and appropriate force" against al Qaeda and its supporters provides

---

law of 'traditional' warfare [are thereby] exposed," the proper solution is "a reevaluation of the laws by the *political branches*, not the judiciary." *Khalid*, 355 F. Supp. 2d at 319 n.10 (emphasis in original). Moreover, the military's practice of releasing enemy combatants following appropriate determinations—and, in some cases, following arrangements with allies in the war on terror—also counsels against any conclusion that the detention is indefinite. *See, e.g.*, Department of Justice, *Statement of Mark Corolla, Director of Public Affairs, Regarding Yaser Hamdi*, *available at* <http://www.usdoj.gov/opa/pr/2004/September/04_opa_640.htm> (announcing agreement regarding release and return of Hamdi to Saudi Arabia under certain conditions).

a sufficiently clear statement from Congress authorizing the detention of enemy combatants, including citizen combatants. The Court determined that "it is of no moment that the AUMF does not use specific language of detention." 124 S. Ct. at 2641 (plurality); *see id.* at 2679 (Thomas, J., dissenting). Rather, Congress's grant of authority "include[s] the authority to detain for the duration of the relevant conflict," an "understanding * * * based on longstanding law-of-war principles." *Id.* at 2641 (plurality); *see id.* at 2679 (Thomas, J., dissenting). As *Quirin* indicates, law-of-war principles hardly exonerate those who engage in sabotage or who enter the territory of an enemy intent on injuring civilians. Moreover, nothing in this Court's cases or in the AUMF itself suggests, as the district court held, that while the detention of enemy combatants captured abroad is "necessary and appropriate" and therefore authorized, the detention of enemy combatants captured while attempting to carry out hostile acts at or within our borders is unnecessary or inappropriate and therefore unauthorized.

Second, and even more fundamentally, nothing in *Quirin*, any other decision of the Supreme Court, the Constitution, or Section 4001(a) requires that Congress "'clearly and unmistakably' grant[ ] the President the authority to hold [Padilla] as an enemy combatant." Op. 17-18.

45

a.    The Court in *Quirin* made no reference whatsoever to the type of clear-statement requirement envisioned by the district court.  To the contrary, to the extent the *Quirin* Court discussed a clear-statement rule, it was precisely the opposite of the one imposed by the district court:  a "detention * * * ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger" is "not to be set aside by the courts without the *clear conviction* that [it is] in conflict with the * * * laws of Congress."  317 U.S. at 25 (emphasis added).

That rule in favor of the Commander in Chief's exercise of his constitutional authority during wartime is consistent with a long line of Supreme Court cases and is fully applicable here.  In ordering Padilla's detention, the President *explicitly invoked* the AUMF.  President's Order, Preamble, App. 16.  Where, as here, the President explicitly acts pursuant to a broad grant of authority from Congress in an area in which he also possesses independent constitutional powers, *see infra* pp. 52-54, the courts may set aside his action as beyond the scope of congressional delegation only in exceptional circumstances.  *See Dames & Moore*, 453 U.S. at 678 ("[T]he enactment of legislation closely related to the question of the President's authority in a particular case which evinces legislative intent to accord the President broad discretion may be considered to 'invite' 'measures on independent presidential

46

responsibility.'" (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring))).

The *Quirin* Court's application of that deferential standard is also instructive and belies any attempt to distinguish the Articles of War at issue there from the broad grant of authority contained in the AUMF. The Articles of War in effect at the time of *Quirin* did not specifically state that they applied to enemy forces at all, let alone make clear that they authorized the President to detain the saboteurs for trial by military commission. *See* 317 U.S. at 27. Article 2 (ch. 227, 41 Stat. 787), entitled "Persons Subject To Military Law," provided that the "following persons are subject to these articles," and the ensuing list referred only to United States personnel. Moreover, Article 15 (41 Stat. 790), on which the Court principally relied (317 U.S. at 27-28), did not affirmatively authorize a military commission but instead preserved, by negative implication, the common-law authorization of commissions: "[T]he provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions * * * of concurrent jurisdiction in respect of offenders or offenses that * * * by the law of war may be triable by such military commissions."[11] 317 U.S. at 27 (quotation omitted). In addition, the Court rested its decision on the general charge, not tethered to any specific Article, of a

---

[11] The current version of this provision is codified at 10 U.S.C. § 821.

47

violation of the common "law of war," rather than relying on the more specific charges of war crimes codified by Congress in Articles 81 and 82, 41 Stat. 804. *See* 317 U.S. at 23, 46. These were not the actions of a Court searching for a clear congressional statement of authority to subject the saboteurs to military jurisdiction, and in any event, whatever standard of clarity one imposes, as *Hamdi* itself confirms, the broad grant of authority in the AUMF is at least as clear as the Articles of War in *Quirin*.

       b.      The district court's reliance (Op. 17) on *Ex parte Endo*, 323 U.S. 283 (1944), to support its supposed clear-statement requirement is likewise misplaced. In *Endo*, the Court instructed that the "fact that the Act" at issue was "silent on detention" did "not of course mean that any power to detain [was] lacking." *Id.* at 301. Ultimately, the Court concluded that, because the statute had the "single aim" of protecting "the war effort against espionage and sabotage," it failed to support the detention of a concededly *loyal* citizen. *Id.* at 300. "Detention which furthered the campaign against espionage and sabotage would be one thing," the Court explained, "[b]ut detention which has no relationship to that campaign is of a distinct character." *Id.* at 302. Here, by contrast, as the case comes to this Court, Padilla's detention is part of a campaign against sabotage and in pursuance of Congress's express aim to "prevent any future acts of international terrorism against the United States" by the

individuals and organizations responsible for the September 11 attacks. 115 Stat. 224, § 2(a). Given the facts assumed to be true for purposes of this appeal, Padilla's military detention has an obvious "relationship to [Congress's] campaign" against "future acts of international terrorism against the United States." Thus, under the logic of *Endo*, the "fact that the [AUMF]" is "silent on detention" "does not * * * mean that any power to detain is lacking." *Id.* at 301. That should have been clear based on *Hamdi*, but in any event, the district court's imposition of a clear-statement rule based on *Endo* was unfounded.

c.     Similarly unfounded was the district court's apparent reliance (Op. 17) on the Second Circuit's now-reversed decision from the first round of this litigation. There, the panel majority concluded that "precise and specific language authorizing the detention of American citizens is required to override [Section 4001(a)'s] prohibition." *Padilla*, 352 F.3d at 720. Yet the Supreme Court specifically rejected that very notion a few months later in *Hamdi*, concluding that "the AUMF satisfie[s] § 4001(a)'s requirement that a detention be 'pursuant to an Act of Congress,'" even though "the AUMF does not use specific language of detention," 124 S. Ct. at 2640, 2641 (plurality); *see id.* at 2679 (Thomas, J., dissenting). Section 4001(a), which regulates detention and draws no distinction based on locus of capture, provides no basis for distinguishing between Padilla and Hamdi.

49

3.   **Both *Hamdi* and *Quirin* make clear that the district court erred in holding that the President must either charge Padilla criminally or suspend the writ of habeas corpus.**

In light of *Hamdi* and *Quirin*, the district court erred in suggesting (Op. 22; *see id.* at 14-16, 21-23 & n.14) that, unless Congress suspends the writ of habeas corpus, Padilla must be charged with a crime or released immediately. To be sure, Justice Scalia's dissenting opinion in *Hamdi* expressed the view of two Justices that, in the absence of a suspension of the writ of habeas corpus, an American citizen detained in the United States must be afforded criminal process. *See* 124 S. Ct. at 2660-2674 (Scalia, J., dissenting). Those two Justices did not draw any distinction based on locus of capture and dismissed *Quirin* as "not th[e] Court's finest hour," *id.* at 2669, which is not an option open to this Court, especially after *Hamdi*. Moreover, no other Justice endorsed that approach, and a majority of the Court specifically rejected it. *See id.* at 2643 (plurality); *id.* at 2682 (Thomas, J., dissenting). Thus, a clear majority of Justices in *Hamdi* reaffirmed the fundamental and unanimous holding of *Quirin* that "[c]itizenship in the United States of an enemy belligerent does not relieve him from the consequences of [his] belligerency," nor limits the government to a criminal prosecution. 317 U.S. at 37; *see Colepaugh* v. *Looney*, 235 F.2d 429, 432-433 (10th Cir. 1956), *cert. denied*, 352 U.S. 1014 (1957); *In re Territo*, 156 F.2d 142, 143-146 (9th Cir. 1946).

The district court's (Op. 14-16) and Padilla's (Mem. 29-33) reliance on *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), in support of this line of reasoning is likewise foreclosed by *Quirin* and *Hamdi*. *Milligan* held that the military lacked authority to subject to trial by military commission a citizen who was alleged to have conspired against the United States in the Civil War. In *Quirin*, the Court unanimously confined *Milligan* to its specific facts and found its holding "inapplicable" to the detention and military trial of the German saboteurs, explaining that Milligan, "not being a part of or associated with the armed forces of the enemy, was a non-belligerent, not subject to the law of war." 317 U.S. at 45. Padilla, like Hamdi, however, is a classic battlefield combatant, and so *Milligan* is equally inapplicable here. Indeed, the plurality in *Hamdi* expressly reaffirmed that *Quirin* is the "most apposite precedent" in this context and that it "both postdates and clarifies *Milligan*." 124 S. Ct. at 2643 (plurality); *see id.* at 2682 (Thomas, J., dissenting). The *Hamdi* Court expressly rejected Justice Scalia's reliance on *Milligan* to the exclusion of *Quirin*, *see* 124 S. Ct. at 2643 (admonishing that "[b]rushing aside [*Quirin*] * * * is unjustified and unwise"), and the district court's attempt to smuggle that same rejected approach into the AUMF's authorization for the President to use "all necessary and appropriate force" is equally illegitimate.

51

**C.    Contrary To The District Court's Holding, The President Has Inherent Authority As Commander In Chief To Order Padilla's Detention As An Enemy Combatant**

Because the *Hamdi* Court concluded that the detention at issue was authorized by the AUMF, it had no occasion to address the President's inherent authority as Commander in Chief to detain a citizen as an enemy combatant, or whether Section 4001(a) does or could permissibly limit that authority.  124 S. Ct. at 2639-2640 (plurality).  Those issues need not be addressed here, either, because the AUMF supplies an ample statutory foundation for Padilla's military detention and satisfies any requirement implied by Section 4001(a). *See supra* pp. 30-36, 44-49.

Nonetheless, it is clear that the President has the inherent authority as Commander in Chief during wartime to order the military detention of combatants affiliated with al Qaeda who enter the United States bent on committing hostile and warlike acts against our citizens.  Congress itself specifically recognized in the AUMF that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." 115 Stat. 224, Preamble. Contrary to the district court's conclusion (Op. 19-21), the Commander-in-Chief Clause grants the President the power to defend the Nation when it is attacked, and he "is bound to accept the challenge without waiting for any special legislative authority." *The Prize Cases*, 67 U.S. at 668; *see Campbell*, 203 F.3d at 27

52

(Silberman, J., concurring) ("[T]he President has independent authority to repel aggressive acts by third parties *even without specific congressional authorization*[.]" (emphasis added)). The President's decision to detain Padilla militarily represents a basic exercise of his authority as Commander in Chief to determine the level of force needed to prevail in the current conflict against al Qaeda and its supporters.

While the district court relied on *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952), for the proposition that "Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy," Op. 20 (quoting *Youngstown*, 343 U.S. at 644 (Jackson, J., concurring)), that principle does not cast doubt on the President's authority here because this case does not involve "domestic policy." The President's order in *Youngstown* that the Secretary of Commerce take control of private steel mills to prevent a work stoppage is different in kind from the President's order that the Secretary of Defense detain Padilla as an enemy combatant in order to prevent him from carrying out a terrorist scheme he planned and trained for, with the aid of al Qaeda operatives, in Afghanistan and Pakistan. The former represents a domestic economic initiative; the latter, by contrast, represents a core exercise of the President's Commander-in-Chief power, which is at its apex when the Nation itself comes under attack. *The Prize Cases*, 67 U.S. at 668; *see Padilla* v. *Rumsfeld*, 352 F.3d 695, 727 (2d Cir. 2003) (Wesley, J., concurring in part and

53

dissenting in part) (whereas in *Youngstown* "the President's attempt to link the [steel] seizure to prosecuting the war in Korea was * * * too attenuated," "[i]n this case the President's authority is directly tied to his responsibilities as Commander in Chief"). The district court's conclusion to the contrary would substantially impair the President's ability to repel an invasion or otherwise protect the homeland against an attack. Nothing in the Constitution or the Supreme Court's cases supports such a restriction on the Commander in Chief's powers. And adopting an enemy-combatant rule that turns on the locus of capture (*e.g.*, Op. 11) would provide the perverse incentive of drawing enemies to the United States, where they could potentially do the most damage, yet under the district court's illogical reasoning evade military jurisdiction.

Likewise, nothing in Section 4001(a) should be read to limit the President's authority to detain enemy combatants in wartime. Congress made clear that intended Section 4001(a) to speak solely to civilian detentions by deliberately styling the provision as an amendment to an existing provision in United States Code Title 18 ("Crimes and Criminal Procedure") rather than Title 10 ("Armed Forces") or Title 50 ("War and National Defense"). That existing provision (*see* 18 U.S.C. § 4001 (1970)) was directed to the Attorney General's control over federal prisons; its terms, which remain unchanged, stated that the "control and management of Federal penal and

54

correctional institutions, *except military or naval institutions*, shall be vested in the
Attorney General." 18 U.S.C. § 4001(b)(1) (emphasis added). If Section 4001(a)
were meant to constrain the President's authority over enemy combatants, and had it
been included in Title 10 or Title 50 alongside other provisions relevant to the war
power, Members of Congress may have alluded to the provision in debating the
AUMF. But no member did so. By contrast, the Members mentioned the War
Powers Resolution, codified in Title 50, over 50 times in the legislative debates and
specifically referenced it in the Authorization. 115 Stat. 224, § 2(b).

The legislative history of Section 4001(a) itself likewise reinforces the
conclusion that the provision does not constrain the President's authority to detain
enemy combatants militarily. That history reflects that the provision was intended to
address the detention of loyal citizens by civilian authorities (as opposed to enemy
combatants by military authorities) — in particular, it was directed at the detention
authority given the Attorney General in the Emergency Detention Act of 1950 and the
detention camps instituted for Japanese-American citizens during World War II. *See*
H.R. Rep. No. 116, 92d Cong., 1st Sess. 2 (1971). But in addressing the very same
subject in *Endo*, the Supreme Court distinguished between detention of loyal citizens
on the one hand and the detention of enemy combatants on the other. In ordering the
release of a concededly loyal citizen from a World War II detention camp, the *Endo*

55

Court "noted at the outset" that it did not confront "a question such as was presented in [*Quirin* or *Milligan*] where the jurisdiction of military tribunals * * * was challenged." 323 U.S. at 297. The Court stressed that Endo was "detained by a civilian agency, the War Relocation Authority, not by the military," and that, "[a]ccordingly, no questions of military law [were] involved." *Id.* at 298. There is no reason to believe that Congress would have ignored that important distinction in enacting Section 4001(a).

Moreover, the district court's reading of Section 4001(a) not only conflicts with the provision's evident purpose, structure, history, and location in the Code, it also raises serious constitutional questions concerning the extent to which Congress may restrict the President's basic authority as Commander in Chief to seize and detain enemy combatants. *See Public Citizen* v. *Dep't of Justice*, 491 U.S. 440, 466 (1989) ("Our reluctance to decide constitutional issues is especially great where, as here, they concern the relative powers of coordinate branches of government. Hence, we are loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils." (citation omitted)).

The substantial constitutional doubts raised by such a construction can be avoided in either of two ways. First, as the Supreme Court did in *Hamdi* itself,

56

Congress's Authorization of Force can be construed consistent with its plain terms and the well-established principle that the authority to detain enemy combatants, regardless of the locus of capture, is part and parcel of the use of military force, thus supplying whatever statutory authority Section 4001(a) may require. Second, Section 4001(a) can be construed, consistent with its evident purpose, structure, and location in the Code, to limit detentions by civilian authorities but not to limit the authority of the military. The court below eschewed both of those saving constructions, adopting instead an unduly narrow construction of the AUMF and an unduly broad construction of Section 4001(a). That was error.

\* \* \*

CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment as

to Counts One and Two of Padilla's habeas petition should be reversed and its order

mandating Padilla's release should be vacated.

Respectfully submitted,

PAUL D. CLEMENT
    Acting Solicitor General

JONATHAN S. GASSER
    United States Attorney
    District of South Carolina

DAVID B. SALMONS
DARYL JOSEFFER
    Assistants to the Solicitor General

STEPHAN E. OESTREICHER, JR.
    Attorney, U.S. Department of Justice
    P.O. Box 899, Ben Franklin Station
    Washington, DC  20044-0899
    (202) 305-1081

MILLER W. SHEALY, JR.
    Assistant United States Attorney
    District of South Carolina

58

## REQUEST FOR ORAL ARGUMENT

This appeal presents a fundamental question about the President's authority during wartime. The government therefore respectfully requests oral argument.

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 05-6396          **Caption:** Jose Padilla v. Commander C.T. Hanft

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because:

*[principal brief may not exceed 14,000 words or 1,300 lines; reply or amicus brief may not exceed 7,000 words or 650 lines; line count can be used only with monospaced type]*

☑      this brief contains 13,930_____ *[state the number of]* words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐      this brief uses a monospaced typeface and contains _____ *[state the number of]* lines of text, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

☑      this brief has been prepared in a proportionally spaced typeface using WordPerfect 12_____ *[state name and version of word processing program]* in 14-pt Times New Roman_____ *[state font size and name of the type style]; or*

☐      this brief has been prepared in a monospaced typeface using _____ _____ *[state name and version of word processing program]* with_____ _____*[state number of characters per inch and name of type style].*

(s)_____

Attorney for Commander C.T. Hanft, Resp.

Dated: May 6, 2005_____

CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record

certifies that the foregoing Opening Brief for the Appellant was this day mailed to

counsel for the petitioner-appellee, Jose Padilla, at the following addresses:

Andrew G. Patel, Esq.
111 Broadway, 13th Floor
New York, NY 10006
(212) 349-0230

Donna R. Newman
121 W. 27th Street, Suite 1103
New York, NY 10001
(212) 229-1516

Jonathan M. Freiman
Wiggin & Dana LLP
195 Church St., P.O. Box 1832
New Haven, CT 06508
(203) 498-4400

Michael P. O'Connell
Stirling & O'Connell
145 King Street, Suite 410
P.O. Box 882
Charleston, SC 29402
(843) 577-9890

Jenny S. Martinez
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-2749

DATED:      MAY 6, 2005

STEPHAN E. OESTREICHER, JR.
Attorney, U.S. Department of Justice
P.O. Box 899, Ben Franklin Station
Washington, DC 20044-0899
(202) 305-1081

## ADDENDUM

(Reproduction of relevant statutes pursuant to Fed. R. App. P. 28(f) and 4th Cir. R. 28(b))

Westlaw.

PL 107-40, 2001 SJRes 23                                         Page 1

PL 107-40, September 18, 2001, **115 Stat 224**
**(Cite as: 115 Stat 224)**

### UNITED STATES PUBLIC LAWS
### 107th Congress - First Session
### Convening January, 2001

Copr. © West Group 2001.  No Claim to Orig. U.S. Govt.Works

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed

PL 107-40 (SJRes 23)
September 18, 2001
AUTHORIZATION FOR USE OF MILITARY FORCE

Joint Resolution To authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States.

Whereas, on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens;  and

Whereas, such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad;  and

Whereas, in light of the threat to the national security and foreign policy of the United States posed by these grave acts of violence;  and

Whereas, such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States;  and

Whereas, the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States: Now, therefore, be it

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 50 USCA § 1541 NOTE >>

SECTION 1. SHORT TITLE.

This joint resolution may be cited as the "Authorization for Use of Military Force".

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PL 107-40, September 18, 2001, **115 Stat 224**
**(Cite as: 115 Stat 224)**

<< 50 USCA § 1541 NOTE >>

SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.

(a) IN GENERAL.--That the President is authorized to use all necessary and
appropriate force against those nations, organizations, or persons he determines
planned, authorized, committed, or aided the terrorist attacks that occurred on
September 11, 2001, or harbored such organizations or persons, in order to prevent
any future acts of international terrorism against the United States by such
nations, organizations or persons.

(b) War Powers Resolution Requirements--

(1) SPECIFIC STATUTORY AUTHORIZATION.--Consistent with section 8(a)(1) of the
War Powers Resolution, the Congress declares that this section is intended to
constitute specific statutory authorization within the meaning of section 5(b) of
the War Powers Resolution.

**\*225** (2) APPLICABILITY OF OTHER REQUIREMENTS.--Nothing in this resolution
supercedes any requirement of the War Powers Resolution.

Approved September 18, 2001.

PL 107-40, 2001 SJRes 23

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

18 U.S.C.A. § 4001

**C**

**Effective: [See Text Amendments]**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part III. Prisons and Prisoners
      Chapter 301. General Provisions

→ **§ 4001. Limitation on detention; control of prisons**

**(a)** No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress.

**(b)(1)** The control and management of Federal penal and correctional institutions, except military or naval institutions, shall be vested in the Attorney General, who shall promulgate rules for the government thereof, and appoint all necessary officers and employees in accordance with the civil-service laws, the Classification Act, as amended and the applicable regulations.

**(2)** The Attorney General may establish and conduct industries, farms, and other activities and classify the inmates; and provide for their proper government, discipline, treatment, care, rehabilitation, and reformation.

CREDIT(S)

(June 25, 1948, c. 645, 62 Stat. 847; Sept. 25, 1971, Pub.L. 92-128, § 1(a), (b), 85 Stat. 347.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1948 Acts. Based on Title 18, U.S.C., 1934 ed., §§ 741 and 753e (Mar. 3, 1891, c. 529, §§ 1, 4, 26 Stat. 839; May 14, 1930, c. 274, § 6, 46 Stat. 326).

This section consolidates said sections 741 and 753e with such changes of language as were necessary to effect consolidation.

"The Classification Act, as amended," was inserted more clearly to express the existing procedure for appointment of officers and employees as noted in letter of the Director of Bureau of Prisons, June 19, 1944. 80th Congress House Report No. 304.

1971 Acts. House Report No. 92-116, see 1971 U.S. Code Cong. and Adm. News, p. 1435.

References in Text

The civil-service laws, referred to in subsec. (b)(1), are set forth in Title 5, Government Organization and Employees. See, particularly, section 3301 et seq. of that Title.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.