Document 1

Document 2

Document 3

NOTICE OF JUDGMENT
September 9, 2005

TO:      Michael Patrick O'Connell, Esq.
Andrew G. Patel, Esq.
Donna Rita Newman, Esq.
Jennifer Martinez, Esq.
Jonathan Marc Freiman, Esq.
Paul Clement, Esq.
David B. Salmons, Esq.
Daryl Langdon Joseffer, Esq.
Stephan Edward Oestreicher Jr., Esq.
Kevin Frank McDonald, Esq.
Richard Abbott Samp, Esq.
Steven D. Benjamin, Esq.
Donald G. Rehkopf Jr., Esq.
David N. Rosen, Esq.
Elliot M. Mincberg, Esq.
Deborah Liu, Esq.
John W. Whitehead, Esq.
Mark E. Haddad, Esq.
Joseph Robert Guerra, Esq.
Robert Nathan Hochman, Esq.
Chad William Pekron, Esq.
Serrin Turner, Esq.
Burt Neuborne, Esq.
Ann Beeson, Esq.
Denyse Williams, Esq.
Arthur Nelson Eisenberg, Esq.
Rebecca Kim Glenberg, Esq.
Matthew S. Dontzin, Esq.
Julia C. Ambrose, Esq.
Katherine C. Stern, Esq.
Paul Reinherz Wolfson, Esq.
Coming Ball Gibbs Jr., Esq.
Shayana Devendra Kadidal, Esq.
Jules Lobel, Esq.
Matthew Strugar, Esq.

Judgment was entered this date in Case Number(s):   05-6396

The Court's decision is enclosed.

PETITION FOR REHEARING (FRAP 40)
PETITION FOR REHEARING EN BANC (FRAP 35)

Filing
Time

A petition must be received in the clerk's office within 14 days after judgment to be timely. There are three exceptions to this rule:

(1)  In all civil cases in which the United States or an agency or officer thereof is a party, any petition for rehearing must be received in the clerk's office within 45 days after entry of judgment.

(2)  The Court may grant an extension of time or leave to file a petition for rehearing out of time if the party establishes that

the delay resulted from the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or other circumstances wholly beyond the control of counsel or a party proceeding without counsel.

(3)  Prisoner petitions are deemed filed when delivered to prison authorities.

If a petition for rehearing en banc is to be filed, it must be filed at the same time and in the same document as the petition for rehearing and must be clearly identified in the title.

Each case number to which the petition applies must be listed on the petition, even in companion or consolidated cases. Failure to list the individual case numbers on the petition will result in the unidentified cases proceeding to mandate even if a timely petition for rehearing has been filed in a companion or consolidated case.

A timely filed petition for rehearing or petition for rehearing en banc will stay the mandate and toll the running of time for filing a petition for writ of certiorari.

Purpose
A petition should only be made to direct the Court's attention to one or more of the following situations:

1. A material fact or law overlooked in the decision.
2. A change in the law which occurred after the case was submitted and which was overlooked by the panel.
3. The opinion is in conflict with a decision of the United States Supreme Court, this Court, or another court of appeals, and the conflict is not addressed in the opinion.
4. The proceeding involves one or more questions of exceptional importance.

Statement of Counsel
A petition shall contain an introduction stating that, in counsel's judgment, one or more of the situations exist as described in the above "Purpose" section.  The points to be raised shall be succinctly listed in the statement.

Form
The 15 page limit allowed by the Rule shall be observed.  The Court requires 4 copies of the petition (20 copies of a petition for rehearing en banc), and a copy of the Court's opinion must be attached to each copy of the petition.

BILL OF COSTS (FRAP 39)

Filing Time
A party to whom costs are allowed, who desires taxation of costs, shall file a bill of costs on or before 09/23/05.

MANDATE (FRAP 41)

Issuance Time
In original proceedings before this Court, there is no mandate. Unless the Court shortens or extends the time, in all other cases, the mandate issues 7 calendar days after the expiration of the time for filing a petition for rehearing.  A timely

petition for rehearing, petition for rehearing en banc, or motion to stay the mandate will stay the issuance.  If the petition or motion is denied, the mandate will issue 7 calendar days later. If a stay of mandate is sought, only the original of a motion need be filed.

Stay      A motion for stay of the issuance of the mandate shall not be granted simply upon request.  Ordinarily the motion will be denied unless it would not be frivolous or filed merely for delay and would present a substantial question or otherwise set forth good or probable cause for a stay.

CRIMINAL CASES (Plan in Implementation of the CJA)

Criminal    In criminal cases, counsel must inform the defendant in writing of the right to file a petition for writ of certiorari from an adverse decision of this Court.  Counsel appointed under the Criminal Justice Act must file their vouchers within 60 days of entry of judgment, denial of a petition for rehearing, or the grant or denial of a petition for writ of certiorari, whichever is later.

PETITION FOR WRIT OF CERTIORARI  (Sup.Ct.R. 13)

Filing     Review on writ of certiorari is not a matter of right, but of
Time      judicial discretion, and will be granted only for compelling reasons.  The petition must be filed in the United States Supreme Court within 90 days of this Court's entry of judgment. The time does not run from the issuance of the mandate.  If a petition for rehearing is timely filed, the time runs from the denial of that petition.  Content, fees, and number of copies of a petition for writ of certiorari are governed by the Rules of the United States Supreme Court.

JUDGMENT

FILED: September 9, 2005

UNITED STATES COURT OF APPEALS

for the

Fourth Circuit


No. 05-6396
CA-04-2221-26AJ


JOSE PADILLA

            Petitioner - Appellee


    v.

C. T. HANFT, U.S.N. Commander, Consolidated Naval Brig.

            Respondent - Appellant


------------------------

WASHINGTON LEGAL FOUNDATION; THE ALLIED EDUCATIONAL
FOUNDATION;

            Amici Supporting Appellant

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS;
COMPARATIVE LAW SCHOLARS AND EXPERTS ON THE LAWS OF THE
UNITED KINGDOM AND ISRAEL; PEOPLE FOR THE AMERICAN WAY
FOUNDATION AND THE RUTHERFORD INSTITUTE; THE BRENNAN CENTER
FOR JUSTICE AT THE NEW YORK UNIVERSITY SCHOOL OF LAW;
AMERICAN CIVIL LIBERTIES UNION; NEW YORK CIVIL LIBERTIES
UNION; AMERICAN CIVIL LIBERTIES UNION OF SOUTH CAROLINA;
AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA; ORIGINAL
CONGRESSIONAL SPONSORS OF 18 U.S.C. SECTION 4001(A);
JANET RENO; PHILIP B. HEYMANN; ERIC H. HOLDER, JR.;
JEFFREY H. SMITH; CENTER FOR NATIONAL SECURITY STUDIES;
CONSTITUTION PROJECT

            Amici Supporting Appellee


--------------------
Appeal from the United States District Court for the
District of South Carolina at Charleston
--------------------

In accordance with the written opinion of this Court

filed this day, the Court reverses the judgment of the District Court.

A certified copy of this judgment will be provided to the District Court upon issuance of the mandate. The judgment will take effect upon issuance of the mandate.


/s/ Patricia S. Connor
_____
CLERK

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 05-6396**

———————

JOSE PADILLA,

Petitioner - Appellee,

versus

C. T. HANFT, U.S.N. Commander, Consolidated
Naval Brig.,

Respondent - Appellant.

---------------------------------------------

WASHINGTON LEGAL FOUNDATION; THE ALLIED
EDUCATIONAL FOUNDATION,

Amici Supporting Appellant,

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS; COMPARATIVE LAW SCHOLARS AND EXPERTS
ON THE LAWS OF THE UNITED KINGDOM AND ISRAEL;
PEOPLE FOR THE AMERICAN WAY FOUNDATION AND THE
RUTHERFORD INSTITUTE; THE BRENNAN CENTER FOR
JUSTICE AT THE NEW YORK UNIVERSITY SCHOOL OF
LAW; AMERICAN CIVIL LIBERTIES UNION; NEW YORK
CIVIL LIBERTIES UNION; AMERICAN CIVIL
LIBERTIES UNION OF SOUTH CAROLINA; AMERICAN
CIVIL LIBERTIES UNION OF VIRGINIA; ORIGINAL
CONGRESSIONAL SPONSORS OF 18 U.S.C. SECTION
4001(A); JANET RENO; PHILIP B. HEYMANN; ERIC
H. HOLDER, JR.; JEFFREY H. SMITH; CENTER FOR
NATIONAL SECURITY STUDIES; CONSTITUTION
PROJECT,

Amici Supporting Appellee.

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  Henry F. Floyd, District Judge.
(CA-04-2221-26AJ)

---

Argued:  July 19, 2005                 Decided:  September 9, 2005

---

Before LUTTIG, MICHAEL, and TRAXLER, Circuit Judges.

---

Reversed by published opinion.  Judge Luttig wrote the opinion for
the Court, in which Judge Michael and Judge Traxler joined.

---

**ARGUED:** Paul Clement, UNITED STATES DEPARTMENT OF JUSTICE,
Department of the Solicitor, Washington, D.C., for Appellant.
Andrew G. Patel, New York, New York, for Appellee.  **ON BRIEF:**
Jonathan S. Gasser, United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Columbia, South Carolina; Miller W. Shealy, Jr.,
Assistant United States Attorney,  OFFICE OF THE UNITED STATES
ATTORNEY, Charleston, South Carolina; David B. Salmons, Assistant
to the Solicitor General, Daryl Joseffer, Assistant to the
Solicitor General, Stephan E. Oestreicher, Jr., UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.  Jenny S.
Martinez, Stanford, California; Michael P. O'Connell, STIRLING &
O'CONNELL, Charleston, South Carolina; Donna R. Newman, New York,
New York; Jonathan M. Freiman, WIGGIN AND DANA, L.L.P., New Haven,
Connecticut, for Appellee.  Daniel J. Popeo, Richard A. Samp,
WASHINGTON LEGAL FOUNDATION, Washington, D.C., for Amici Curiae,
Washington Legal Foundation and The Allied Educational Foundation,
Supporting Appellant.  Steven D. Benjamin, BENJAMIN & DESPORTES,
P.C., Richmond, Virginia; Donald G. Rehkopf, Jr., BRENNA & BRENNA,
P.L.L.C., Rochester, New York, for Amicus Curiae, National
Association of Criminal Defense Lawyers, Supporting Appellee.
David N. Rosen, DAVID ROSEN & ASSOCIATES, P.C., New Haven,
Connecticut; Mary J. Hahn, ALLARD K. LOWENSTEIN INTERNATIONAL HUMAN
RIGHTS CLINIC, New Haven, Connecticut, for Amicus Curiae,
Comparative Law Scholars and Experts on the Laws of the United
Kingdom and Israel, Supporting Appellee.  Elliot M. Mincberg,
Deborah Liu, PEOPLE FOR THE AMERICAN WAY FOUNDATION, Washington,
D.C.; John W. Whitehead, THE RUTHERFORD INSTITUTE, Charlottesville,
Virginia; Mark E. Haddad, Joseph R. Guerra, Robert N. Hochman, Chad
W. Pekron, SIDLEY, AUSTIN, BROWN & WOOD, L.L.P., Washington, D.C.,
for Amici Curiae, People for the American Way Foundation and The
Rutherford Institute, Supporting Appellee.  Serrin Turner, Burt

Neuborne, BRENNAN CENTER FOR JUSTICE, New York University School of Law, New York, New York, for Amicus Curiae, The Brennan Center for Justice at the New York University School of Law, Supporting Appellee. Ann Beeson, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Denyse Williams, ACLU OF SOUTH CAROLINA, Columbia, South Carolina; Arthur N. Eisenberg, NEW YORK CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Rebecca K. Glenberg, ACLU OF VIRGINIA FOUNDATION, Richmond, Virginia, for Amici Curiae, American Civil Liberties Union, New York Civil Liberties Union, American Civil Liberties Union of South Carolina, American Civil Liberties Union of Virginia, Incorporated, Supporting Appellee. Matthew S. Dontzin, Brian S. Koukoutchos, Fiona M. Doherty, THE DONTZIN LAW FIRM, L.L.P., New York, New York, for Amici Curiae, Original Congressional Sponsors of 18 U.S.C. Section 4001(A), Supporting Appellee. Julia C. Ambrose, Katherine E. Stern, JONES DAY, Washington, D.C.; Deborah N. Pearlstein, Avidan Y. Cover, HUMAN RIGHTS FIRST, New York, New York, for Amici Curiae, Janet Reno, Philip B. Heymann, Eric H. Holder, Jr., and Jeffrey H. Smith, Supporting Appellee. Kate Martin, CENTER FOR NATIONAL SECURITY STUDIES, Washington, D.C. Joseph Onek, THE CONSTITUTION PROJECT, Washington, D.C.; Paul R. Q. Wolfson, WILMER, CUTLER, PICKERING, HALE AND DORR, L.L.P., Washington, D.C.; Kate Hutchins, WILMER, CUTLER, PICKERING, HALE AND DORR, L.L.P., New York, New York, for Amici Curiae, Center for National Security Studies and Constitution Project, Supporting Appellee.

LUTTIG, Circuit Judge:

Appellee Jose Padilla, a United States citizen, associated with forces hostile to the United States in Afghanistan and took up arms against United States forces in that country in our war against al Qaeda. Upon his escape to Pakistan from the battlefield in Afghanistan, Padilla was recruited, trained, funded, and equipped by al Qaeda leaders to continue prosecution of the war in the United States by blowing up apartment buildings in this country. Padilla flew to the United States on May 8, 2002, to begin carrying out his assignment, but was arrested by civilian law enforcement authorities upon his arrival at O'Hare International Airport in Chicago.

Thereafter, in a letter to the Secretary of Defense, the President of the United States personally designated Padilla an "enemy combatant" against this country, stating that the United States is "at war" with al Qaeda, that "Mr. Padilla engaged in conduct that constituted hostile and war-like acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States," and that "Mr. Padilla represents a continuing, present and grave danger to the national security of the United States." Having determined that "detention of Mr. Padilla is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel,

-4-

or citizens," the President directed the Secretary of Defense to take Padilla into military custody, in which custody Padilla has remained ever since.  The full text of the President's memorandum to the Secretary of Defense reads as follows:

**THE WHITE HOUSE**

**WASHINGTON**

**FOR OFFICIAL USE ONLY**

**TO THE SECRETARY OF DEFENSE:**

Based on the information available to me from all sources,

**REDACTED**

In accordance with the Constitution and consistent with the laws of the United States, including the Authorization for Use of Military Force Joint Resolution (Public Law 107-40);

I, GEORGE W. BUSH,  as  President of the United States and Commander in Chief of the U.S. armed forces, hereby DETERMINE for the United States of America that:

(1) Jose Padilla, who is under the control of the Department of Justice and who is a U.S. citizen, is, and at the time he entered the United States in May 2002 was, an enemy combatant;

(2) Mr. Padilla is closely  associated with al Qaeda, an international terrorist organization with which the United States is at war;

(3) Mr. Padilla engaged in conduct that constituted hostile and war-like acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States;

(4) Mr. Padilla possesses intelligence, including intelligence about personnel and activities of al Qaeda, that, if communicated to the U.S., would aid U.S. efforts to prevent attacks by al Qaeda on the United States or its armed forces, other governmental personnel, or citizens;

(5) Mr. Padilla represents a continuing, present and grave danger to the national security

of the United States, and detention of Mr. Padilla is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens;

(6) it is in the interest of the United States that the Secretary of Defense detain Mr. Padilla as an enemy combatant; and

(7) it is        REDACTED        consistent with U.S. law and the laws of war for the Secretary of Defense to detain Mr. Padilla as enemy combatant.

Accordingly, you are directed to receive Mr. Padilla from the Department of Justice and to detain him as an enemy combatant.

DATE:  June 9, 2002                            Signature
                                               /George Bush/

The exceedingly important question before us is whether the President of the United States possesses the authority to detain militarily a citizen of this country who is closely associated with al Qaeda, an entity with which the United States is at war; who took up arms on behalf of that enemy and against our country in a foreign combat zone of that war; and who thereafter traveled to the United States for the avowed purpose of further prosecuting that war on American soil, against American citizens and targets.

We conclude that the President does possess such authority pursuant to the Authorization for Use of Military Force Joint Resolution enacted by Congress in the wake of the attacks on the United States of September 11, 2001.  Accordingly, the judgment of the district court is reversed.

I.

Al Qaeda operatives recruited Jose Padilla, a United States citizen, to train for jihad in Afghanistan in February 2000, while Padilla was on a religious pilgrimage to Saudi Arabia.[1] J.A. 18-19.  Subsequently, Padilla met with al Qaeda operatives in Afghanistan, received explosives training in an al Qaeda-affiliated camp, and served as an armed guard at what he understood to be a Taliban outpost.  Id. at 19-20.  When United States military operations began in Afghanistan, Padilla and other al Qaeda operatives moved from safehouse to safehouse to evade bombing or capture.  Id. at 20.  Padilla was, on the facts with which we are presented, "armed and present in a combat zone during armed conflict between al Qaeda/Taliban forces and the armed forces of the United States."  Id. at 21.

Padilla eventually escaped to Pakistan, armed with an assault rifle.  Id. at 20-21.  Once in Pakistan, Padilla met with Khalid Sheikh Mohammad, a senior al Qaeda operations planner, who directed Padilla to travel to the United States for the purpose of blowing up apartment buildings, in continued prosecution of al Qaeda's war of terror against the United States.  See id. at 22. After receiving further training, as well as cash, travel documents, and communication devices, Padilla flew to the United

---

[1] For purposes of Padilla's summary judgment motion, the parties have stipulated to the facts as set forth by the government.  J.A. 30-31.  It is only on these facts that we consider whether the President has the authority to detain Padilla.

States in order to carry out his accepted assignment.  Id. at 22-23.

Upon arrival at Chicago's O'Hare International Airport on May 8, 2002, Padilla was detained by FBI agents, who interviewed and eventually arrested him pursuant to a material witness warrant issued by the district court for the Southern District of New York in conjunction with a grand jury investigation of the September 11 attacks.  Id. at 93.  Padilla was transported to New York, where he was held at a civilian correctional facility until, on June 9, 2002, the President designated him an "enemy combatant" against the United States and directed the Secretary of Defense to take him into military custody.  Id. at 16, 94. Since his delivery into the custody of military authorities, Padilla has been detained at a naval brig in South Carolina.  Id. at 162-63.

On June 11, 2002, Padilla filed a petition for a writ of habeas corpus in the Southern District of New York, claiming that his detention violated the Constitution.  Id. at 164.  The Supreme Court of the United States ultimately ordered Padilla's petition dismissed without prejudice, holding that his petition was improperly filed in the Southern District of New York. Rumsfeld v. Padilla, 124 S. Ct. 2711, 2727 (2004).  And on July 2, 2004, Padilla filed the present petition for a writ of habeas corpus in the District of South Carolina.  J.A. 166.

The district court subsequently held that the President lacks the authority to detain Padilla, id. at 180-81, that Padilla's detention is in violation of the Constitution and laws of the United States, id., and that Padilla therefore must either be criminally charged or released, id. at 183.  This appeal followed.  We expedited consideration of this appeal at the request of the parties, hearing argument in the case on July 19, 2005.

II.

A.

The Authorization for Use of Military Force Joint Resolution (AUMF), upon which the President explicitly relied in his order that Padilla be detained by the military and upon which the government chiefly relies in support of the President's authority to detain Padilla, was enacted by Congress in the immediate aftermath of the September 11, 2001, terrorist attacks on the United States.  It provides as follows:

> [T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (September 18, 2001).

The Supreme Court has already once interpreted this Joint

Resolution in the context of a military detention by the President.  In <u>Hamdi</u> v. <u>Rumsfeld</u>, 124 S. Ct. 2633 (2004), the Supreme Court held, on the facts alleged by the government, that the AUMF authorized the military detention of Yaser Esam Hamdi, an American citizen who fought alongside Taliban forces in Afghanistan, was captured by United States allies on a battlefield there, and was detained in the United States by the military.[2]  <u>Id</u>. at 2635-37, 2641.  The "narrow question," <u>id</u>. at 2639, addressed by the Court in <u>Hamdi</u> was "whether the Executive has the authority to detain citizens who qualify as 'enemy combatants,'" <u>id</u>., defined for purposes of that case as "individual[s] who . . . [were] '"part of or supporting forces hostile to the United States or coalition partners"' in Afghanistan and who '"engaged in an armed conflict against the United States"' there," <u>id</u>.  The controlling plurality of the Court answered that narrow question in the affirmative, concluding, based upon "longstanding law-of-war principles," <u>id</u>. at 2641, that Hamdi's detention was "necessary and appropriate" within the meaning of the AUMF because "[t]he capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement and

---

[2] Having concluded that detention was authorized on the facts alleged by the government, the Court in <u>Hamdi</u> remanded the case for a hearing to determine, pursuant to the due process requirements set forth in its opinion, whether those alleged facts were true. <u>Hamdi</u>, 124 S. Ct. at 2635, 2648-52.

practice,' are 'important incident[s] of war,'" id. at 2640

(quoting Ex parte Quirin, 317 U.S. 1, 28 (1942)). The rationale

for this law-of-war principle, Justice O'Connor explained for the

plurality, is that "detention to prevent a combatant's return to

the battlefield is a fundamental incident of waging war." Id. at

2641.

As the AUMF authorized Hamdi's detention by the President,

so also does it authorize Padilla's detention. Under the facts

as presented here, Padilla unquestionably qualifies as an "enemy

combatant" as that term was defined for purposes of the

controlling opinion in Hamdi. Indeed, under the definition of

"enemy combatant" employed in Hamdi, we can discern no difference

in principle between Hamdi and Padilla. Like Hamdi, Padilla

associated with forces hostile to the United States in

Afghanistan. Compare J.A. 19-23 (detailing Padilla's association

with al Qaeda in Afghanistan and Pakistan), with Hamdi, 124 S.

Ct. at 2637 (describing Hamdi's affiliation with the Taliban in

Afghanistan). And, like Hamdi, Padilla took up arms against

United States forces in that country in the same way and to the

same extent as did Hamdi. Compare J.A. 21 (averring that Padilla

was "armed and present in a combat zone during armed conflict

between al Qaeda/Taliban forces and the armed forces of the

United States"), and id. at 20-21 (alleging that Padilla was

"armed with an assault rifle" as he escaped to Pakistan), with

<u>Hamdi</u>, 124 S. Ct. at 2642 n.1 (noting that the asserted basis for detaining Hamdi was that he "carr[ied] a weapon against American troops on a foreign battlefield"), <u>and id</u>. at 2637 (quoting Mobbs Affidavit that Hamdi had "'surrender[ed] his Kalishnikov assault rifle'" to Northern Alliance forces (alteration in original)). Because, like Hamdi, Padilla is an enemy combatant, and because his detention is no less necessary than was Hamdi's in order to prevent his return to the battlefield, the President is authorized by the AUMF to detain Padilla as a fundamental incident to the conduct of war.

Our conclusion that the AUMF as interpreted by the Supreme Court in <u>Hamdi</u> authorizes the President's detention of Padilla as an enemy combatant is reinforced by the Supreme Court's decision in <u>Ex parte Quirin</u>, 317 U.S. 1 (1942), on which the plurality in <u>Hamdi</u> itself heavily relied.  In <u>Quirin</u>, the Court held that Congress had authorized the military trial of Haupt, a United States citizen who entered the country with orders from the Nazis to blow up domestic war facilities but was captured before he could execute those orders.  <u>Id</u>. at 20-21, 28, 46.  The Court reasoned that Haupt's citizenship was no bar to his military trial as an unlawful enemy belligerent, concluding that "[c]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts, are enemy belligerents within

-12-

the meaning of . . . the law of war." Id. at 37-38.

Like Haupt, Padilla associated with the military arm of the
enemy, and with its aid, guidance, and direction entered this
country bent on committing hostile acts on American soil. J.A.
22-23. Padilla thus falls within Quirin's definition of enemy
belligerent, as well as within the definition of the equivalent
term accepted by the plurality in Hamdi. Compare Quirin, 317
U.S. at 37-38 (holding that "[c]itizens who associate themselves
with the military arm of the enemy government, and with its aid,
guidance and direction enter this country bent on hostile acts,
are enemy belligerents within the meaning of . . . the law of
war"), with Hamdi, 124 S. Ct. at 2639 (accepting for purposes of
the case the government's definition of "enemy combatants" as
those who were "'"part of or supporting forces hostile to the
United States or coalition partners"'" in Afghanistan and who
'"engaged in an armed conflict against the United States"'
there").

We understand the plurality's reasoning in Hamdi to be that
the AUMF authorizes the President to detain all those who qualify
as "enemy combatants" within the meaning of the laws of war, such
power being universally accepted under the laws of war as
necessary in order to prevent the return of combatants to the
battlefield during conflict. Id. at 2640-41. Given that Padilla
qualifies as an enemy combatant under both the definition adopted

by the Court in <u>Quirin</u> and the definition accepted by the controlling opinion in <u>Hamdi</u>, his military detention as an enemy combatant by the President is unquestionably authorized by the AUMF as a fundamental incident to the President's prosecution of the war against al Qaeda in Afghanistan.[3]

### B.

Padilla marshals essentially four arguments for the conclusion that his detention is unlawful. None of them ultimately is persuasive.

### 1.

Recognizing the hurdle to his position represented by the Supreme Court's decision in <u>Hamdi</u>, Padilla principally argues that his case does not fall within the "narrow circumstances" considered by the Court in that case because, although he too stood alongside Taliban forces in Afghanistan, he was seized on American soil, whereas Hamdi was captured on a foreign battlefield. In other words, Padilla maintains that capture on a foreign battlefield was one of the "narrow circumstances" to which the plurality in <u>Hamdi</u> confined its opinion. We disagree. When the plurality articulated the "narrow question" before it,

---

[3] Under <u>Hamdi</u>, the power to detain that is authorized under the AUMF is not a power to detain indefinitely. Detention is limited to the duration of the hostilities as to which the detention is authorized. 124 S. Ct. at 2641-42. Because the United States remains engaged in the conflict with al Qaeda in Afghanistan, Padilla's detention has not exceeded in duration that authorized by the AUMF.

it referred simply to the permissibility of detaining "an individual who . . . was '"part of or supporting forces hostile to the United States or coalition partners"' in Afghanistan and who '"engaged in an armed conflict against the United States"' there." Id. at 2639. Nowhere in its framing of the "narrow question" presented did the plurality even mention the locus of capture.

The actual reasoning that the plurality thereafter employed is consistent with the question having been framed so as to render locus of capture irrelevant. That reasoning was that Hamdi's detention was an exercise of "necessary and appropriate force" within the meaning of the AUMF because "detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war." Id. at 2641. This reasoning simply does not admit of a distinction between an enemy combatant captured abroad and detained in the United States, such as Hamdi, and an enemy combatant who escaped capture abroad but was ultimately captured domestically and detained in the United States, such as Padilla. As we previously explained, Padilla poses the same threat of returning to the battlefield as Hamdi posed at the time of the Supreme Court's adjudication of Hamdi's petition. Padilla's detention is thus "necessary and appropriate" to the same extent as was Hamdi's.

Padilla directs us to a passage from the plurality's opinion

-15-

in Hamdi in which, when responding to the dissent, the plurality
charged that the dissent "ignore[d] the context of th[e] case: a
United States citizen captured in a foreign combat zone."  Id. at
2643.  Padilla argues that this passage proves that capture on a
foreign battlefield was one of the factual circumstances by which
the Court's opinion was limited.  If this language stood alone,
Padilla's argument as to the limitation of Hamdi at least would
have more force, though to acknowledge that foreign battlefield
capture was part of the context of the case still is not to say
(at least not necessarily) that the locus of capture was
essential to the Court's reasoning.  However, this language
simply cannot bear the weight that Padilla would have it bear
when it is considered against the backdrop of both the quite
different limitations that were expressly imposed by the Court
through its framing of the question presented, and the actual
reasoning that was employed by the Court in reaching its
conclusion, which reasoning was consistent with the question
having been framed so as to render an enemy combatant's point of
capture irrelevant to the President's power to detain.  In short,
the plurality carefully limited its opinion, but not in a way
that leaves room for argument that the President's power to
detain one who has associated with the enemy and taken up arms
against the United States in a foreign combat zone varies
depending upon the geographic location where that enemy combatant

happens to be captured.

Our conclusion that the reasoning in <u>Hamdi</u> does not support a distinction based on the locus of capture is buttressed by the plurality's analysis of <u>Quirin</u>. Although at issue in <u>Quirin</u> was the authority of the President to subject a United States citizen who was also an enemy combatant to military trial, the plurality in <u>Hamdi</u> went to lengths to observe that Haupt, <u>who had been captured domestically</u>, could instead have been permissibly <u>detained</u> for the duration of hostilities. <u>See id</u>. at 2640. That analysis strongly suggests, if it does not confirm, that the plurality did not regard the locus of capture (within or without the United States) as relevant to the President's authority to detain an enemy combatant who is also a citizen, and that it believed that the detention of such a combatant is not more or less a necessary incident of the President's power to wage war depending upon the locus of eventual capture.

Given the lack of any reference to locus of capture in the plurality's articulation of the "narrow question" before it, the absence of any basis in <u>Hamdi</u>'s reasoning for a distinction between foreign and domestic capture of one who has both associated with the enemy and taken up arms against the United States on behalf of that enemy in a foreign combat zone, and the plurality's understanding of and reliance upon <u>Quirin</u> as a precedent that would permit the detention of an enemy combatant

who had been captured domestically, we simply cannot ascribe to the rejoinder to Justice Scalia the significance, much less the dispositive significance, that Padilla urges.[4]

2.

Padilla also argues, and the district court held, that Padilla's military detention is "neither necessary nor appropriate" because he is amenable to criminal prosecution. J.A. 172. Related to this argument, Padilla attempts to distinguish <u>Quirin</u> from his case on the grounds that he has simply been detained, unlike Haupt who was charged and tried in <u>Quirin</u>. Neither the argument nor the attempted distinction is convincing.

As to the fact that Padilla can be prosecuted, the availability of criminal process does not distinguish him from Hamdi. If the mere availability of criminal prosecution rendered detention unnecessary within the meaning of the AUMF, then Hamdi's detention would have been unnecessary and therefore unauthorized, since he too was detained in the United States and

---

[4] Padilla also argues that the locus of capture should be legally relevant to the scope of the AUMF's authorization because there is a higher probability of an erroneous determination that one is an enemy combatant when the seizure occurs on American soil. It is far from clear that this is actually the case. In any event, Padilla's argument confuses the scope of the President's <u>power</u> to detain enemy combatants under the AUMF with the <u>process</u> for establishing that a detainee is in fact an enemy combatant. <u>Hamdi</u> itself provides process to guard against the erroneous detention of non-enemy combatants. 124 S. Ct. at 2648-52.

amenable to criminal prosecution.  We are convinced, in any
event, that the availability of criminal process cannot be
determinative of the power to detain, if for no other reason than
that criminal prosecution may well not achieve the very purpose
for which detention is authorized in the first place -- the
prevention of return to the field of battle.  Equally important,
in many instances criminal prosecution would impede the Executive
in its efforts to gather intelligence from the detainee and to
restrict the detainee's communication with confederates so as to
ensure that the detainee does not pose a continuing threat to
national security even as he is confined –- impediments that
would render military detention not only an appropriate, but also
the necessary, course of action to be taken in the interest of
national security.

The district court acknowledged the need to defer to the
President's determination that Padilla's detention is necessary
and appropriate in the interest of national security.  <u>See</u> <u>id</u>. at
179.  However, we believe that the district court ultimately
accorded insufficient deference to that determination,
effectively imposing upon the President the equivalent of a
least-restrictive-means test.  To subject to such exacting
scrutiny the President's determination that criminal prosecution
would not adequately protect the Nation's security at a very
minimum fails to accord the President the deference that is his

when he acts pursuant to a broad delegation of authority from Congress, such as the AUMF.

As for Padilla's attempted distinction of Quirin on the grounds that, unlike Haupt, he has never been charged and tried by the military, the plurality in Hamdi rejected as immaterial the distinction between detention and trial (apparently regarding the former as a lesser imposition than the latter), noting that "nothing in Quirin suggests that [Haupt's United States] citizenship would have precluded his mere detention for the duration of the relevant hostilities." Hamdi, 124 S. Ct. at 2640 (emphasis added).

3.

Padilla, citing Ex parte Endo, 323 U.S. 283 (1944), and relying upon Quirin, next argues that only a clear statement from Congress can authorize his detention, and that the AUMF is not itself, and does not contain, such a clear statement.

In Endo, the Court did state that, when asked to find implied powers in a wartime statute, it must assume that "the law makers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language [the law makers] used." Id. at 300. The Court almost immediately thereafter observed, however, that the "fact that the Act" at issue was "silent on detention [did] not of course mean that any power to detain [was] lacking," id. at 301, an observation that

-20-

proves that the Court did not adopt or even apply in that case a

"clear statement" rule of the kind for which Padilla argues.[5]

Padilla contends that <u>Quirin</u> also supports the existence of

a clear statement rule. However, in no place in <u>Quirin</u> did the

Court even purport to establish a clear statement rule. In its

opinion, the Court did note that Congress had "explicitly"

authorized Haupt's military trial. <u>See</u> 317 U.S. at 28. But to

conclude from this passing note that the Court required a clear

statement as a matter of law would be unwarranted. In fact, to

the extent that <u>Quirin</u> can be understood to have addressed the

need for a clear statement of authority from Congress at all, the

rule would appear the opposite:

> [T]he detention and trial of petitioners -- ordered by
> the President in the declared exercise of his powers as
> Commander in Chief of the Army in time of war and of
> grave public danger -- are not to be set aside by the
> courts without the clear conviction that they are in
> conflict with the Constitution or laws of Congress
> constitutionally enacted.

<u>Id</u>. at 25.

---

[5] At issue in <u>Endo</u> was the detention of a "concededly loyal"
citizen, not an enemy combatant. 323 U.S. at 302. In the face of
the statute's silence on detention, the Court looked to the
statute's purpose -- the prevention of espionage and sabotage -- to
determine whether Endo's detention was authorized. <u>See</u> <u>id</u>. at 300-
02. The Court concluded that it was not, because detention of a
concededly loyal citizen bore no relation to the prevention of
espionage and sabotage. <u>Id</u>. at 302. Padilla's detention, by
contrast, emphatically does further the purpose of the AUMF -- "to
prevent any future acts of international terrorism against the
United States," Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001).

Of course, even were a clear statement by Congress required, the AUMF constitutes such a clear statement according to the Supreme Court. In <u>Hamdi</u>, stating that "it [was] of no moment that the AUMF does not use specific language of detention," 124 S. Ct. at 2641, the plurality held that the AUMF "clearly and unmistakably authorized" Hamdi's detention, <u>id</u>. Nothing in the AUMF permits us to conclude that the Joint Resolution clearly and unmistakably authorized Hamdi's detention but not Padilla's. To the contrary, read in light of its purpose clause ("in order to prevent any future acts of international terrorism against the United States") and its preamble (stating that the acts of 9/11 "render it both necessary and appropriate . . . to protect United States citizens both at home and abroad"), the AUMF applies even more clearly and unmistakably to Padilla than to Hamdi. Padilla, after all, in addition to supporting hostile forces in Afghanistan and taking up arms against our troops on a battlefield in that country like Hamdi, <u>also</u> came to the United States in order to commit future acts of terrorism against American citizens and targets.

These facts unquestionably establish that Padilla poses the requisite threat of return to battle in the ongoing armed conflict between the United States and al Qaeda in Afghanistan, and that his detention is authorized as a "fundamental incident of waging war," <u>id</u>., in order "to prevent a combatant's return to

the battlefield," id. Congress "clearly and unmistakably," id.,
authorized such detention when, in the AUMF, it "permitt[ed] the
use of 'necessary and appropriate force,'" id., to prevent other
attacks like those of September 11, 2001.

4.

Finally, Padilla argues that, even if his detention is
authorized by the AUMF, it is unlawful under Ex parte Milligan,
71 U.S. (4 Wall.) 2 (1866). In Milligan, the Supreme Court held
that a United States citizen associated with an anti-Union secret
society but unaffiliated with the Confederate army could not be
tried by a military tribunal while access to civilian courts was
open and unobstructed. Id. at 6-7, 121. Milligan purported to
restrict the power of Congress as well as the power of the
President. Id. at 121-22 ("[N]o usage of war could sanction a
military trial . . . for any offence whatever of a citizen in
civil life, in nowise connected with the military service.
Congress could grant no such power . . ."). Quirin, however,
confirmed that Milligan does not extend to enemy combatants. As
the Court in Quirin explained, the Milligan Court's reasoning had
"particular reference to the facts before it," namely, that
Milligan was not "a part of or associated with the armed forces
of the enemy." See 317 U.S. at 45. The Hamdi plurality in turn
reaffirmed this limitation on the reach of Milligan, emphasizing
that Quirin, a unanimous opinion, "both postdates and clarifies

_Milligan_." 124 S. Ct. at 2643. Thus confined, _Milligan_ is
inapposite here because Padilla, unlike Milligan, associated
with, and has taken up arms against the forces of the United
States on behalf of, an enemy of the United States.


III.

The Congress of the United States, in the Authorization for
Use of Military Force Joint Resolution, provided the President
all powers necessary and appropriate to protect American citizens
from terrorist acts by those who attacked the United States on
September 11, 2001. As would be expected, and as the Supreme
Court has held, those powers include the power to detain
identified and committed enemies such as Padilla, who associated
with al Qaeda and the Taliban regime, who took up arms against
this Nation in its war against these enemies, _and_ who entered the
United States for the avowed purpose of further prosecuting that
war by attacking American citizens and targets on our own soil --
a power without which, Congress understood, the President could
well be unable to protect American citizens from the very kind of
savage attack that occurred four years ago almost to the day.

The detention of petitioner being fully authorized by Act of
Congress, the judgment of the district court that the detention
of petitioner by the President of the United States is without
support in law is hereby reversed.

REVERSED.